**STATE OF ALASKA et al., Appellants,**

v.

**Cecil D. ANDRUS et al.**

No. 76–1829.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 17, 1977.

Decided Feb. 24, 1978.

Rehearing Denied April 24, 1978.

Appeal from the United States District Court for the District of Columbia (D.C.Civil 76–0368).

Sanford Sagalkin, Asst. Atty. Gen. of Alaska, Juneau, Alaska, Supreme Court of Alaska pro hac vice by special leave of Court and Bruce J. Terris, Washington, D. C., with whom Avrum M. Gross, Atty. Gen. of Alaska, Juneau, Alaska, was on the brief, for appellants.

Kathryn A. Oberly, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Raymond N. Zagona and William M. Cohen, Attys., Dept. of Justice, Washington, D. C., were on the brief, for federal appellees. Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for federal appellees.

E. Edward Bruce, Washington, D. C., for appellees, Western Oil & Gas Ass'n, et al.

Before BAZELON, Chief Judge, and LEVENTHAL and WILKEY, Circuit Judges.

Opinion for the Court filed by Chief Judge BAZELON.

BAZELON, Chief Judge:

On April 13, 1976, the Department of the Interior (DOI) offered for bid over one million acres of oil and gas leases in the Gulf of Alaska (GOA) Outer Continental Shelf (OCS). Appellants challenge the legality of that lease sale and seek to have it set aside. They argue both that the Environmental Impact Statement (EIS) prepared by DOI in connection with the sale does not satisfy the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and that the Secretary of the Interior's decision to proceed with the sale in April, 1976 was itself a violation of the Act, because of the alleged inadequacy of the information available to the Secretary at that time. Appellants originally sought to enjoin the sale; however, the district court denied their motion for a preliminary injunction, and this court refused to grant appellants an injunction pending appeal. DOI was thus able to conduct the sale on April 13 as planned. Thereafter, the parties agreed to submit the case on the merits to the district court on the basis of the record compiled at the preliminary injunction stage of the proceedings; the district court concluded that the appellees had complied with all applicable statutes, and en-

tered a final judgment dismissing the complaint.

We have determined that, on the facts of this case, it would be inappropriate for us to set aside the lease sale and to enjoin the exploratory drilling now underway in the Gulf of Alaska. However, this is on the premise that the Secretary's undertaking prior to the sale, to confine environmental damage through departmental operating orders governing exploration and drilling, will be given meaningful effect through prompt reconsideration of the operating orders already issued, with an environmental impact statement that presents discussion of alternatives.

## I. BACKGROUND OF LEASE SALE NO. 39

On January 23, 1974, former President Nixon announced that as part of "Project Independence"[1] he was directing the Secre-

tary of the Interior "to increase the acreage leased on the Outer Continental Shelf to 10 million acres beginning in 1975, more than tripling what had originally been planned."[2] The President ordered the Secretary, in carrying out this directive, "to ensure that . . . environmental safeguards are observed."[3] In addition, the President pointed out that there would be "no decision on leasing on the Outer Continental Shelf in the Atlantic and in the Gulf of Alaska until the Council on Environmental Quality [CEQ] completes its current environmental study of those areas."[4]

The CEQ study to which the President referred was released on April 18, 1974.[5] That study concluded that the environmental risks associated with OCS development varied from region to region but that of the regions studied, development in the Eastern Gulf of Alaska would post the *highest* level of environmental risks.[6] Indeed, CEQ con-

1. "Project Independence" was the name the former President gave to his program, announced on November 7, 1973, to free the United States from dependence on foreign sources of oil. *See* 9 Compilation of Presidential Documents 1309, 1317 (1973).

2. 10 Compilation of Presidential Documents 69, 84 (1974), J.A. at 365.

3. *Id.*

4. *Id.*

5. Council on Environmental Quality, *OCS Oil and Gas—An Environmental Assessment: A Report to the President by the Council on Environmental Quality* (1974) (CEQ Report), Record No. 7 Exhibit 3.

6. *Id.* at 6. The National Academy of Sciences prepared a critique of the CEQ study which was included as a part of that study. The NAS agreed with CEQ that development in the Gulf of Alaska would entail "high risk," *id.* at 194, and concluded that "[i]t is clear that the available data do not recommend the development of OCS resources at the present time in the Gulf of Alaska." *Id.* at 201. *See also* a report prepared for the Environmental Protection Agency, *Energy Development: The Environmental Tradeoffs*, Vol. 3: *Relative Environmental Ranking of Proposed Offshore Continental Shelf Areas on the Basis of Impacts of Oil Spills* (September, 1975) (EPA Report), Record No. 7, Exhibit 17. That study concluded that of ten OCS regions studied, "[t]he regions judged

most likely to suffer damage from oil spills are Bristol Bay (Alaska), Cook Inlet (Alaska), and the Gulf of Alaska." *Id.* at 2. See also the EPA's comments on the draft PEIS, dated January 10, 1975:

> [The CEQ] study documented the need for caution in development and assessed frontier areas in order of environmental risk. Some of these areas, especially the Gulf of Alaska, contain unique and vulnerable natural resources combined with significant natural hazards that would make precipitous development highly undesirable from an environmental standpoint.

PEIS, Vol. II, at 380.

The "unique and vulnerable natural resources" to be found in the Gulf of Alaska area include the largest marine mammal habitat in the nation, EPA Report, *supra* at 28, and the most important bird habitat in the world, with the possible exception of the Bering Sea, EIS, Vol. III, at 12. The Gulf is also an important commercial fishing grounds. EIS, Vol. I, at 197 *et seq.*; EPA Report, *supra* at 24–5. The portion of Alaska bordering on the gulf is a sparsely populated wilderness area possessing a "pristine environment." EIS, Vol. I, at 397.

The "significant natural hazards" in this region include an unusually high susceptibility to serious earthquakes. Of the areas studied in the EPA Report, *supra*, the Gulf is "the most susceptible to severe earthquakes. . . ." *Id.* at 45. Richter 7 earthquakes are predicted to occur every three-to-five years in the Gulf (as opposed to once every 100 years in the Atlantic); Richter 8 earthquakes are predicted

cluded that the "conditions in the Gulf of Alaska are more severe than the [oil and gas] industry has yet experienced anywhere in the world." [7]

On October 18, Interior published a draft programmatic EIS (PEIS) analyzing the President's proposed acceleration of OCS leasing to 10 million acres per year.[8] The Environmental Protection Agency (EPA) reviewed the draft and informed Interior that "in accordance with the EPA rating system for environmental statements, we have classified this statement as Category 3, Inadequate." [9] The statement, in EPA's view, had failed to address "key policy options and managerial issues pertaining to an accelerated OCS oil and gas leasing program." [10] EPA was especially critical of the proposed inclusion of Alaskan OCS areas in the leasing schedule:

The CEQ Task Force on the OCS, in which DOI participated, states that the petroleum industry would encounter a higher environmental risk in the development of the Gulf of Alaska than in any other area. DOI has not been able to demonstrate that the benefit in oil development outweighs the environmental cost. In fact, *DOI's own data . . . show conclusively that because of material constraints, there is no relative advantage to leasing Alaskan OCS areas at this time despite the magnitude of Alaska's reserves. EPA's position is therefore that leasing in Alaskan waters should not be considered at this time and that substantial technical and biological research*

*is required.* Although we expect that as a result of that research, exploration and subsequent production will be feasible at some point in the future, EPA believes that the point cannot be predicted at this time. *In our opinion, it is therefore neither necessary nor prudent for Alaskan OCS areas to be placed on the leasing schedule at this time.* We think that the future decision should be based on (1) baseline and biological effects research, most of which has not been funded or planned at this time, (2) coastal zone planning, and (3) assessment of operating experience with advanced technologies which can be tested in other OCS areas.[11]

In response to these comments from EPA, and to comments from the State of Alaska and others, Interior indicated that it fully concurred in CEQ's analysis of the relative environmental risks associated with OCS development in various regions,[12] and agreed that development in the Gulf of Alaska would be "highly hazardous." [13] "The Gulf of Alaska," it said, "is a high risk area." [14] Nonetheless, Interior's "Proposed Planning Schedule," issued in November, 1974, scheduled the Gulf of Alaska for leasing earlier than any of the other lower-risk areas examined in the CEQ Study.[15]

A draft "site-specific" EIS (EIS or Sale No. 39 EIS) focusing on this proposed sale in the GOA, was next prepared. The following steps were taken in the preparation of that EIS:

a. On November 27, 1974, notice of a call for nominations of tracts suitable for

once very twenty-five years. CEQ Report, *supra* at 81. In addition, wave heights in the Gulf regularly reach eight feet or more (a factor which would seriously complicate attempts to clean up any oil spills in this region). EIS, Vol. II, at 674–5. Storms are more frequent in the Gulf than anywhere else in the Northern Hemisphere. CEQ Report, *supra* at 78–80.

7. CEQ Report, *supra* n. 5, at iii.

8. In *California ex rel. Younger v. Morton*, 404 F.Supp. 26 (C.D.Cal.1975), *appeal pending*, No. 76–1431 (9th Cir.), the PEIS was found to satisfy the requirements of NEPA. The adequacy of the PEIS is not at issue here.

9. PEIS, Vol. II, at 379.

10. *Id.*

11. *Id.* at 386 (emphasis added).

12. *Id.* at 401.

13. *Id.* at 98.

14. *Id.* at 401.

15. *See* J.A. at 93–4. Delays in initiating the leasing program led Interior to issue a revised leasing schedule in June, 1975. EIS, Vol. III, Appendix 1–1. The revised schedule left the order of proposed sales essentially unchanged. *Id.*

oil and gas leasing in the Northern Gulf of Alaska was published in the Federal Register. . . .

b. In this same notice, Interior requested comments from all interested parties on possible oil and gas leasing in the general area of the call for nominations. Interior asked that such comments include, but need not be limited to, environmental, technical, and socioeconomic aspects of potential oil and gas leasing and development in the area.

c. After receipt of numerous nominations and comments pursuant to this notice, the BLM [Bureau of Land Management] Alaska OCS Office and the U.S. Geological Survey (USGS) field office prepared joint tentative tract recommendations.

d. On March 20, 1975, the Secretary publicly announced that certain identified tracts, totaling 3.5 million acres, had been tentatively selected for further environmental study to be made in connection with the Department's on-going consideration of a possible OCS lease sale offshore the Northern Gulf of Alaska in 1975.

e. Studies and analyses of potential oil and gas leasing and development of the proposed sale area were undertaken to provide an information base for a draft EIS. BLM's Alaska OCS Office then prepared a draft EIS for proposed lease sale No. 39, which was submitted to the Council on Environmental Quality (CEQ) and made available to federal, state, and local agencies and interested members of the public on June 27, 1975. . . .

f. In the course of its consideration of the OCS oil and gas lease sale proposal in the Northern Gulf of Alaska, the Department involved the State of Alaska in the various procedures followed by the Department in considering that lease sale. State and local agencies and citizens groups were invited to designate experts to work with BLM's staff in the preparation of the draft EIS for the lease sale. Findings of Fact by the District Court, J.A. at 44–45.

Public hearings were held on the draft site-specific EIS in Anchorage, Alaska. Government officials, environmental groups, and members of the public were invited to testify and to submit written comments on the draft EIS. Pursuant to this request, comments were received from a number of departments of the State of Alaska. *Id.* at 46. In its comments on the draft, EPA again stressed the lack of reliable information on the environmental hazards that would be encountered in the GOA, and urged that exploration and development in that region be delayed:

In view of the substantial environmental risks of proceeding at this time with the proposed sale, we strongly urge the Department to more actively consider delaying the proposed action while, at the same time pursuing the biological baseline studies and other studies which would provide a better information base for designing and implementing technology to mitigate the environmental hazards. *We believe the sale should be delayed at least until the biological baseline work is completed.* . . .[16]

---

**16.** EIS, Vol. III, at 98 (emphasis added). *See also id.* at 100–101.

The baseline studies referred to by EPA include, in particular, a major environmental research program undertaken in the GOA in mid-1974 by the National Oceanic and Atmospheric Administration (NOAA), in cooperation with BLM. This research program was described by CEQ as "[t]he principal vehicle for improved understanding of frontier OCS regions. . ." J.A. at 241. The study was designed as a four-to-five year research effort. J.A. at 381. However, at the time the Secretary made his decision to proceed with Sale No. 39, there had been only one full year of field research. J.A.

at 241. Accordingly, the data available from the program at that time were "quite limited." *Id.* CEQ indicated in January, 1976, that "the environmental/oceanographic data base for tract selection and operations regulation can be substantially improved by at least two more years of work under" the NOAA program. *Id.* Interior indicated in the EIS that "[a] delay of approximately ½ to 1½ years would allow for completion of all preoperational phases of the environmental studies program. . . . A delay of up to 4 years would allow for completion of the longer term or 'ecological relationship' studies." EIS, Vol. II, at 678.

Following the hearings and comment period, the Department revised the site-specific draft EIS in light of the comments received. J.A. at 46.

On November 18, 1975, the Bureau of Land Management (BLM) published a final EIS for the lease sale in the Northern Gulf of Alaska. In addition to the final EIS, BLM prepared a Program Decision Option Document (PDOD) for the lease sale, which discussed the major issues to be considered by the Secretary and identified the alternative courses of action that were available. The PDOD explained the advantages and disadvantages of several alternatives, which ranged from a lease sale of 1.8 million acres to more restricted lease sales to no sales at all. Id. at 47.

The final EIS for the lease sale makes note of EPA's recommendation that the sale be delayed,[17] and includes a brief discussion of the "alternative" of delaying the sale "pending completion of studies in the Northern Gulf of Alaska concerning the potential environmental impacts of offshore minerals development."[18] This final EIS was once again submitted to EPA, pursuant to § 309 of the Clean Air Act Amendments of 1970, 42 U.S.C. § 1857h–7. That provision requires the Administrator of EPA to "review and comment in writing on the environmental impact" of federal actions to which NEPA applies. If the Administrator should determine that a proposed action is environmentally "unsatisfactory," § 309(b) requires him to publish his determination and refer the matter to CEQ. On December 18, the Administrator informed the Secretary that EPA had

> concluded that the action as proposed and presently scheduled is unsatisfactory

from the standpoint of environmental quality based on its potentially harmful effects to the environment and on the fact that potential operational and technical safeguards which might be utilized may not adequately protect the environment from hazards arising from this action.[19]

EPA again argued that the sale should be delayed in order to allow, inter alia, the completion of the environmental studies.[20] Accordingly, under the terms of § 309(b), the Administrator referred the question of Sale No. 39 to CEQ.

Following this § 309 referral, the Council, Interior, EPA, and other interested agencies engaged in an "intensive review of the objections raised by Administrator Train. . . ."[21] Based on this review, CEQ informed the Secretary that it agreed with EPA that "it would be most desirable, from an environmental point of view, to delay the sale. . . ."[22] However, while CEQ urged the Secretary to "give careful consideration to that opinion," it also suggested an alternative, fallback position, in the event that the Secretary should decide that "a blanket delay of the sale is not in the national interest . . . ."[23] The Council acknowledged that it was the Secretary who had to make the "final decision" and who had to balance "the environmental benefits" of delay against "the costs of postponing potential oil and gas production and revenues."[24] But, if after conducting such a balancing, the Secretary concluded that some sale was required immediately, CEQ "strongly urge[d] that the sale be limited to those tracts that, relative to other tracts in the original proposal, appear to represent the lowest possible degree of risk

**17.** EIS, Vol. III, at 114.

**18.** Id., Vol. II, at 676–679. See Part II A(2) infra.

**19.** J.A. at 184.

**20.** Id. at 185–6.

**21.** Id. at 233.

**22.** Id. at 236. Other federal agencies also noted the need for additional research, and recommended delay. See, e. g., EIS, Vol. III, at 61

(Coast Guard); J.A. at 211–13 (U.S. Department of Commerce, National Marine Fisheries Service); EIS, Vol. III, at 77 (U.S. Department of Commerce); J.A. at 407–08 (Marine Mammal Commission); Id. at 189 (U.S. Fish and Wildlife Service).

**23.** J.A. at 236.

**24.** Id.

of environmental damage." [25] Specifically, CEQ urged that any sale be restricted to "a contiguous block" of tracts "in the northeasternmost zone of the original sale proposal," comprising a total of some .15 million acres. This area, in CEQ's view, was both "highly promising in oil and gas potential and relatively low in vulnerability to environmental damage." [26]

The Secretary's staff subsequently prepared a Status Report and Decision Paper on the CEQ recommendations, which served as a supplement to the PDOD. It contained both a discussion of the advantages and disadvantages of the CEQ recommendations and alternatives to them. J.A. at 48. Interior also prepared a third option paper called the Tract Selection Option Paper. This document supplemented the PDOD by posing additional options for tract offerings in the event the Secretary decided to proceed with the lease sale. The options included the recommendation of CEQ. *Id.*

Upon consideration of these materials and consultation with the CEQ, EPA, the National Oceanographic and Atmospheric Administration and the Federal Energy Administration, the Secretary concluded, on February 17, 1976, that sufficient information was available to identify and reduce environmental risks from exploration and production in the Sale No. 39 area, and thus decided to proceed with the sale.

On that date, the Secretary informed CEQ of his decision to proceed with the sale as scheduled. In response to the suggestions that the sale be delayed, the Secretary indicated that, in his "considered judgment,"

> delays of . . . [several years] in the lease sale would not gain us enough to be worth the cost in postponement of development of the resources. I am convinced that we already know what the major hazards are in oil and gas development of the Gulf of Alaska; further studies will refine that knowledge, but they are unlikely to change it fundamentally. I am further convinced that the operating orders, safety requirements, and lease stipulations developed by the Bureau of Land Management and the U.S. Geological Survey will reduce those hazards to levels which are acceptable.[27]

Although the Secretary indicated that he had decided to reduce the amount of acreage to be offered for leasing from the 1.8 million acres originally proposed to some 1.1 million acres, he rejected the CEQ suggestion of a sale restricted to .15 million acres of contiguous tracts in one limited area of the Gulf. The Secretary stated that the .7 million acres he had eliminated from the sale removed

> by far the most risky tracts . . ., that the remaining overall probability of damaging accidents is low, and that the potential value to the Nation of discoveries in this area is very high. If we are to make sizeable discoveries, we must make sizeable acreage available for exploration. Unwarranted risks should not be taken, and in my judgment the tracts I have included in the offering can all be developed with a favorable balance of benefits to risks.[28]

On February 25, 1976, CEQ sent to the Secretary its final evaluation of the sale decision. The Council indicated that it was "greatly disappointed" with the Secretary's decision "to proceed with a sale of such magnitude and such wide dispersion of tracts." [29] Such a sale would, in its view, pose "unwarranted risks to the natural re-

---

25. *Id.*

26. *Id.* at 236–7. This "limited sale" option was first proposed to CEQ by EPA, in a letter dated January 19, 1976. *Id.* at 401. The Administrator of EPA informed the Chairman of CEQ that "[i]f in the national interest it becomes imperative to proceed with the sale this year, it is our view that such an action could *only* be made environmentally satisfactory" if the sale were limited to the .15 million acres described in CEQ's letter to Interior. *Id.* at 404 (emphasis added). CEQ's recommendations to Interior were also endorsed by Interior's own National OCS Advisory Board. *Id.* at 413.

27. *Id.* at 699.

28. *Id.* at 700.

29. *Id.* at 413.

sources and environment of the northern Gulf of Alaska and to the communities bordering it;"[30] accordingly, the council expressly affirmed EPA's determination, made pursuant to § 309 of the Clean Air Act, that the sale was "environmentally unsatisfactory."[31] The Council argued that Interior had "consistently failed to recognize the truly unique environmental conditions of the Gulf of Alaska," and it reiterated its view that "the information available simply does not justify" the Secretary's decision:

> [I]n our view, the OCS program for the Northern Gulf of Alaska has not progressed to the point where the information is adequate for making sound leasing decisions or conducting operations beyond the limited area we recommended and under the most tightly controlled conditions.[32]

On April 6, 1976, after receipt of new data, the Secretary withdrew an additional 92,000 acres from the sale area, by deleting all tracts west of Kayak Island, which had been identified by CEQ as an area of particular environmental concern.[33] The remaining 189 tracts, comprising approximately one million acres, were offered for sale on April 13, 1976. Of these 189 tracts, only 81 received bids. The Secretary then rejected five of those 81 bids and accepted the remaining high bids for 76 tracts.[34] These tracts comprised approximately 410,000 acres. J.A. at 49.

## II. THE ISSUES

### A. *The Alternative of Delay*

Appellants make two related arguments with respect to the Secretary's decision not to delay the sale. They argue, first, that the information available to the Secretary in April, 1976, was insufficient, as a matter of law, to permit a decision to proceed with the sale at that time. They argue, second,

that even if this lack of information did not absolutely preclude a sale in April, 1976, the Secretary's response to the suggestions that the sale be delayed was inadequate; they contend, in other words, that the analysis in the EIS of the "alternative of delay" was insufficient, and that the Secretary failed to articulate (either in the EIS or elsewhere) the reasons that led him to reject the advice of EPA, CEQ, and others.

We discuss each of these arguments in turn.

1.

The district court concluded that "[t]he information and the studies which were available to the Secretary were sufficient to permit the preparation of an EIS which meets the requirements of NEPA. . . ." Conclusion of Law No. 7, J.A. at 56. Appellants strenuously disagree. They argue that even though the EIS may have been based on the best information available as of the date of its preparation, under NEPA the "best available information" may not be good enough. They contend that NEPA imposes on agencies affirmative information-gathering obligations; and until those obligations have been satisfactorily carried out—until, that is, sufficient data has been amassed "to provide a factual basis for responsible impact prediction or mitigation," Appt.'s Br. at 31—NEPA imposes an absolute bar to proceeding with a given project. *Id.* at 31–2.

Appellants conceded, of course, that these information-gathering obligations, like an agency's other NEPA obligations, are necessarily bounded by a "rule of reason;"[35] but they contend that Interior's action here was clearly "unreasonable." They agree that agencies need not "wait forever to fathom the unfathomable, or arrive at definitive answers on questions far beyond

---

**30.** *Id.* at 414.

**31.** *Id.* See p. 10 *supra.*

**32.** *Id.* at 414–415.

**33.** *Id.* at 89.

**34.** *Id.* at 90.

**35.** *Natural Resources Defense Council, Inc. (NRDC) v. Morton,* 148 U.S.App.D.C. 5, 15, 458 F.2d 827, 837 (1972).

the existing state of scientific or technological ability." Appt. Br. at 35. Where, however, the data deficiencies are substantial, and where the present level of scientific ability is adequate to cure those deficiencies within a reasonable period of time, appellants contend that those deficiencies *must* be rectified before the project may be allowed to proceed. Thus, in the present case, appellants argue that the Secretary really had no discretion to reject the suggestions of CEQ and others that the sale be delayed in order to allow further progress in the ongoing environmental research program. The data to be obtained from that additional research were, in appellants' view, an essential prerequisite to the Secretary's lease-sale decision.

■ As a preliminary matter, we note that NEPA does, unquestionably, impose on agencies an affirmative obligation to seek out information concerning the environmental consequences of proposed federal actions. Indeed, this is one of NEPA's most important functions. As this court has held, "the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known." *Scientists' Institute for Public Information, Inc. v. AEC (SIPI)*, 156 U.S.App.D.C. 395, 408, 481 F.2d 1079, 1092 (1973). And prediction—or, at least, *informed* prediction—is only possible after an agency has conducted a thorough inquiry into all aspects of the contemplated project and the area to be affected.

■ Predictions, however, by their very nature, can never be perfect; and the information available to an agency could always be augmented. The question in each case is, "How much information is enough?" And that is not a question to which NEPA

provides a clear, firm answer. Certainly, NEPA cannot be

> read as a requirement that *complete* information concerning the environmental impact of a project must be obtained before action may be taken. If we were to impose a requirement that an impact statement can never be prepared until *all* relevant environmental effects were known, it is doubtful that any project could ever be initiated.[36]

Some element of "speculation" is "implicit in NEPA." [37] And just as agencies may not be allowed "to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry,' " [38] so also agencies may not be precluded from proceeding with particular projects merely because the environmental effects of that project remain to some extent speculative. NEPA simply does not specify the quantum of information that must be in the hands of a decisionmaker before that decisionmaker may decide to proceed with a given project. Rather,

> NEPA was intended to ensure that decisions about federal actions would be made only after responsible decisionmakers had fully adverted to the environmental consequences of the actions, and had decided that the public benefits flowing from the actions outweighed their environmental costs.[39]

One of the costs that must be weighed by decisionmakers is the cost of uncertainty—*i. e.*, the costs of proceeding without more and better information. Where that cost *has* been considered, and where the responsible decisionmaker has decided that it is outweighed by the benefits of proceeding with the project without further delay, the courts may not substitute their judgment

---

36. *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1280 (9th Cir. 1973) (emphasis added). Some environmental impacts will always be unknown at the time a decision to proceed is made; indeed, "one of the functions of a NEPA statement is to indicate the extent to which environmental effects are essentially unknown." *SIPI, supra,* 156 U.S.App.D.C. at 408, 481 F.2d at 1092.

37. *SIPI, supra,* 156 U.S.App.D.C. at 408, 481 F.2d at 1092.

38. *Id.*

39. *Jones v. District of Columbia Redevelopment Land Agency,* 162 U.S.App.D.C. 366, 376, 499 F.2d 502, 512 (1974).

for that of the decisionmaker and insist that the project be delayed while more information is sought. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).[40]

We thus hold that the Secretary was not required, as a matter of law, to await the results of the ongoing studies before deciding to proceed with the lease sale. Even though the "alternative of delay" was vigorously advocated by CEQ, EPA, and others, it is the Secretary of the Interior who has been charged by Congress with the responsibility for deciding whether, and when, to lease portions of the OCS; in making those decisions, the Secretary *did* have the discretion to reject the advice that had been offered to him.

2.

While the Secretary was thus not required to *accept* the "alternative of delay," he was required to give full and careful consideration to that alternative prior to reaching his decision. Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), specifies that an EIS must contain a "detailed statement" of "alternatives to the proposed action." And § 102(2)(E) of the Act requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action . . . ." As noted *supra,* the final Sale No. 39 EIS does make note of EPA's recommendation that the sale be delayed, and includes a brief discussion of the "alternative of delay." [41] Appellants argue, however, that that discussion is insufficient to satisfy the requirements of NEPA.

As this court and others have frequently pointed out, NEPA requires agencies to engage in a "finely tuned and 'systematic' balancing analysis," in which the environmental costs of proposed projects are compared to and balanced against their economic and other benefits. *Calvert Cliffs'*

*Coordinating Committee, Inc. v. AEC,* 146 U.S.App.D.C. 33, 37, 449 F.2d 1109, 1113 (1971). The requirement that agencies prepare "detailed" environmental impact statement aids this broader purpose in several ways. First, the statement aids the agency's own decisionmaking process, by ensuring that the agency has before it "all possible approaches to a particular project . . . which would alter the environmental impact and the cost-benefit balance." *Id.,* 146 U.S.App.D.C. at 38, 449 F.2d at 1114. Moreover, the statement provides evidence that "the mandated decision making process has in fact taken place . . . ." *Id.* Finally, and most importantly, the statement makes it possible for "those removed from the initial process"—in other agencies, in Congress, and in the public—"to evaluate and balance the factors on their own." *Id.; NRDC v. Morton, supra,* 148 U.S.App.D.C. at 11, 458 F.2d at 833.

The "detailed statement" of "alternatives to the proposed action" called for by § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), has been aptly characterized as "the linchpin of the entire impact statement." *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 697–8 (2d Cir. 1972); *NRDC v. Callaway,* 524 F.2d 79, 92–3 (2d Cir. 1975). This statement must not simply *list* possible alternatives; instead, it must contain a "detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives . . . ." *NRDC v. Callaway, supra* at 92; *NRDC v. Morton, supra,* 148 U.S.App.D.C. at 12, 458 F.2d at 834. The CEQ's Guidelines on the Preparation of Environmental Impact Statements indicate that the statement should include a "rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions," including "the alternative of taking

**40.** Nor are the environmental agencies empowered to substitute their judgment for that of the responsible agency official. As the CEQ noted in its letter of January 23, 1976, to the Secretary, urging that the sale be delayed, "[t]he Council recognizes, of course, that the final decision is yours and that you must decide

whether the environmental benefits gained by such delay outweigh the costs of postponing potential oil and gas production and revenues." J.A. at 236.

**41.** See nn. 17 & 18, *supra.*

no action pending further study . . . ." 40 C.F.R. § 1500.8(4). The statement's analysis "should be sufficiently detailed to reveal the agency's comparative evaluation of the environmental benefits, costs and risks of the proposed action and each reasonable alternative." *Id.* The discussion of alternatives "must go beyond mere assertions" if it is to fulfill its vital role of "exposing the reasoning and data of the agency proposing the action to scrutiny by the public and by other branches of the government." *Callaway, supra* at 93, 94; *Silva v. Lynn,* 482 F.2d 1282, 1286–7 (1st Cir. 1973). An agency may not, in other words, "keep[] its thought processes under wraps." *Ely v. Velde,* 451 F.2d 1130, (4th Cir. 1971).

The discussion of the "alternative of delay" in the Sale No. 39 EIS is brief—consisting of three pages out of 1700 in the final EIS. *See* EIS Vol. II at 676–79. The statement discusses the benefits of delay in general terms.[42] It notes that "a delay of approximately ½ to 1½ years would allow for completion of all preoperational phases of the environmental studies program in the northern Gulf of Alaska . . . ." *Id.* at 678. And the statement concedes

that "[t]he information obtained from the completion of these studies prior to holding the proposed sale would provide a greater degree of confidence than presently exists concerning the leasing of any given OCS area and the siting of offshore facilities, including pipelines, in relation to geologic, oceanographic, and biotic parameters." *Id.* However, the statement contains no information whatsoever as to the *costs* of such a delay.

NEPA's requirement that an agency discuss "alternatives to the proposed action" is subject to a "rule of reason,"[43] and that rule of reason necessarily governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them. Here the EIS does not even avert to the costs of delay in terms of lost oil production opportunities, and makes no attempt to quantify the benefits to be expected from delay. Nor can quantitative estimates of the costs and benefits of delay be found in any of the documents prepared by DOI after publication of the final EIS, including the Secretary's letter of February 17, 1976 to the Chairman of the CEQ, informing him of the decision to proceed with the sale as scheduled.[44]

---

42. *Aside from the statement's reference to the* "greater degree of confidence" that would result from delay, the only discussion of the benefits of delay is the following:

> Completion of the studies could provide the necessary information that could prompt deletion of a tract or tracts prior to holding the sale based on unacceptable potential environmental risk. Presently unknown impacts could be avoided or reduced, but until all studies are completed and analyzed, impacts can only be speculative.
> It is conceivable that information obtained from the environmental studies would provide a basis for the preparation of additional special stipulations and for the additional protection of environmental values prior to holding the proposed sale.

EIS, Vol. II, at 679. The discussion of the alternative of delay makes no reference to the vigorous advocacy of this alternative by EPA, the State of Alaska, and others.

43. *See* n. 35 *supra.*

44. *See* p. 13 *supra.*

The Secretary's duty to consider the alternative of delay is underlined by the EPA/CEQ determinations, made pursuant to § 309 of the

Clean Air Act, that the sale was "environmentally unsatisfactory." *See* nn. 19 & 31 and accompanying text *supra.* As we have noted, these determinations did not *bar* Interior from proceeding with the sale; but they did give rise to a heightened obligation on Interior's part to explain clearly and in detail its reasons for proceeding. It seems clear to us that § 309 was intended to do something more than merely reiterate § 102(2)(C) of NEPA, which itself requires the *transmittal* of impact statements to CEQ. The Senate Report on § 309 notes that NEPA permits CEQ *review* of environmental impact statements, but suggests that mere review may not be enough:

> [NEPA] does not assure that Federal Environmental agencies will effectively participate in the decisionmaking process. It is essential that mission-oriented Federal agencies have access to environmental expertise in order to give adequate consideration to environmental factors.

S.Rep.No.1196, 91st Cong., 2d Sess. 43 (1970). It was evidently Congress' intention, in enacting § 309, to make the environmental agencies more "effective participants" in the decisionmaking process, and to assure more "adequate consideration" of their views by the "mission-

The question is, was it reasonable to proceed without quantitative estimates?[45] Appellants to not indicate how the Secretary could have made a quantitative estimate of benefits to be expected from delay. We can assume for discussion that the Interior Department had data that would permit some quantitative estimate of crude oil that might be available from the lease sites, and the time frame of delivery. There still remains the question whether and to what extent NEPA requires, in these circumstances, something in the nature of a quantitative cost-benefit analysis. Often such analyses are misleading, since the difficulty of assigning quantitative values to environmental considerations tends to minimize their significance. In the last analysis the decisionmaker is left with a comparison of non-commensurable entities—damage to the environment versus added energy resources. We recognize that it is a central purpose of NEPA to compel an agency to make such comparisons. Yet the agency retains, under NEPA, reasonable discretion to decide when it has sufficient information to choose intelligently between alternative courses of action that affect the environment. The Secretary's letter to the chairman of CEQ stated that this was an "especially difficult instance of the problem of balancing two of the Nation's highest priorities, energy supply and environmental protection" but that he had become convinced "that on balance it is in the National interest to move ahead with the lease sale."[46]

For the present, we find it unnecessary to decide whether the Secretary's rejection of the alternative of delay represents a reasonable exercise of this discretion. The period of delay originally recommended by EPA and CEQ has by now very nearly elapsed. It would obviously be somewhat anomalous to set the sale aside now, so that the Secretary could reconsider whether, in early 1976, he should have postponed a sale decision until mid-1977. More importantly, however, although the Secretary decided not to delay a sale decision pending the results of the studies in the Gulf, those studies have been continuing. Accordingly, most, if not all, the data that CEQ considered necessary for the initial sale decision have by now presumably been gathered; and these data will obviously be available to the Secretary when he considers, on remand, whether to change the operating orders.

oriented Federal agencies." We believe that this requires, at a minimum, that where the environmental agencies have concluded that a particular project is "environmentally unsatisfactory," and where a "mission-oriented" agency has nonetheless decided to proceed with the project, it must articulate clearly its reasons for doing so. In light of our conclusion that it would be anomalous to set aside the lease sale at this late date, we find it unnecessary to determine with further precision the nature of the added burden imposed on the agency by § 309.

**45.** Speaking only for himself, the writer of this opinion believes that the court should also consider whether the Secretary's balancing was sufficiently particularized—whether he was required to weigh *these* energy resources against the unusually grave environmental risks of *this* particular sale. Although "the energy shortage is practically a matter capable of judicial notice," Govt. Br. at 56 n. 29, this does not mean that the mere invocation of the energy shortage necessarily constitutes a sufficient explanation for every policy decision that will in any way alleviate that shortage. The "energy shortage" is unhelpful as an explanation because it proves far too much—it would also justify (or fail to justify) a sale larger, earlier, or less regulated than the sale at issue here. This kind of "explanation" may preclude intelligent evaluation of the Secretary's decision by those outside the agency—and it was precisely that kind of evaluation that NEPA was intended to facilitate.

**46.** *See* J.A. at 698 *et seq.* In addition to this letter and the EIS, the Secretary also apparently had before him at the time he made the decision to proceed a so-called Program Decision Option Document (PDOD) prepared by BLM, and a "Status Report and Decision Paper" on CEQ's suggestions prepared by the Secretary's own staff. Govt. Br. at 10–12, 55. The PDOD's discussion of the option of delay simply repeats, virtually verbatim, the discussion of that subject in the EIS. *See* J.A. at 518–519. The "Status Report and Decision Paper," J.A. at 450–51, is somewhat more helpful, but there is absolutely no indication in the record that the Secretary's decision to proceed with the sale was, in fact, premised on this staff analysis of the "costs of delay."

## B. *The Operating Orders*

The OCS Lands Act, 43 U.S.C. § 1331 et seq., grants to the Secretary of the Interior broad responsibility for administering an oil and gas leasing program on the OCS. That responsibility has in turn been divided between two subdivisions of the Interior Department (subject, of course, to the Secretary's ultimate supervisory authority). The Bureau of Land Management is charged with the primary responsibility for administering the actual leasing of particular tracts. *See* 43 C.F.R. § 3300 *et seq.; see also* Affidavit of Stanley Doremus, Deputy Assistant Secretary of the Interior for Program Development and Budget (Doremus Affidavit), J.A. at 649–650. It is thus BLM that conducted Lease Sale No. 39, and that authored the EIS challenged here. On the other hand, the United States Geological Survey (USGS) has the primary responsibility for supervising and regulating the lessees' operations on the leased tracts. *See* 30 C.F.R. § 250.1 *et seq.* and EIS, Vol. II, at 553; *see also* EIS, Vol. III, at 164. In carrying out this supervisory authority, USGS both enforces the operating regulations set forth at 30 C.F.R. § 250.1 *et seq.,* and promulgates detailed "operating orders" (hereinafter, Orders) for each region in which drilling operations are contemplated. These Orders govern the manner in which exploration and development may be carried out, and specify, *inter alia,* the safety and environmental standards that lessees will be required to meet. *See* 30 C.F.R. §§ 250.2(j); 250.11; 250.12(a). USGS published draft Orders for the Gulf of Alaska on January 6, 1975;[47] these Orders were adopted, with some revisions, effective March 1, 1976.[48]

The draft Orders are attached as an appendix to the EIS published November 18, 1975. The contents of the Orders is described briefly in a section of the EIS entitled "Mitigating Measures Included in the Proposed Action."[49] Appellants argue that more was required. They note that decisions regarding *how* OCS operations are to be conducted, which are incorporated in the Orders, may be at least as significant as decisions regarding *whether* to allow OCS development at all in a particular region. Appellants' Br. at 10. Accordingly, they contend that Interior was required to prepare a "detailed" evaluation of the environmental impact of the Orders, either in a separate EIS focusing on the Orders themselves, or as a part of the Sale No. 39 EIS. In particular, they argue that Interior was required to evaluate *alternatives* to those Orders that were actually adopted.

■ As a preliminary matter, we agree with the district court that the Secretary was not required to prepare a *separate* EIS on the Orders, and that "[i]t was within the discretion of the Secretary to consider the OCS Orders within the context of the EIS for Sale No. 39."[50] While the Orders may have considerable impact on the environment, that impact can arise only after a lease sale has been held and drilling operations have commenced under the terms of the Orders. The promulgation of the Orders cannot, by itself, affect the environment in any way. *Cf. NRDC v. NRC,* 178 U.S.App.D.C. 336, 356 n.57, 547 F.2d 633, 653 n.57 (1976), *cert. granted sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977). The Secretary was, of course, free to prepare a separate EIS on the Orders; and such a course might well have been desirable, since the Orders do extend to a much broader geographical area than any individual lease sale. Nonetheless, we cannot say that his decision to defer consideration of the impact of the Orders until a particular sale was contemplated was unreasonable.

■ While the Secretary could thus consider the impact of the Orders within the context of the Sale No. 39 EIS, the more

---

47. 40 Fed.Reg. 1086 (1975), *reprinted* at EIS, Vol. III, Appendix 2.

48. 41 Feg.Reg. 10105 (1976), *reprinted* in J.A. at 216 *et seq.*

49. EIS, Vol. II, at 552 *et seq.*

50. Conclusion of Law 8, J.A. at 56.

important issue is whether the "consideration" given to the Orders in that EIS was adequate. We conclude that it was not. As noted *supra*, the EIS merely describes the Orders that had been proposed and adopted; there is no attempt to evaluate the environmental impact of those Orders, as opposed to other Orders that might have been adopted. In essence, the EIS simply treats the Orders as a given—*i. e.*, the environmental impact of the lease sale is evaluated on the assumption that any exploration and development in the sale area will be conducted in accordance with those particular Orders.[51]

The Secretary argues that a fuller evaluation of the Orders, and of possible alternative orders, was not required, because "these orders are nothing more than methods of mitigating potential adverse environmental impacts and promoting safety . . . ." Govt.Br. at 47.[52] This description of the Orders raises the question of whether or in what circumstances NEPA applies to agency action that has a beneficial effect on the environment.

We find it unnecessary to address this broad issue on the facts before us. The Operating Orders in the case at bar present a far narrower question. They are not bestowed by the Secretary of the Interior out of sheer beneficence toward the environment. Rather, they represent a central mechanism by which the Secretary carries out his undertaking to keep to a minimum the adverse impact of the lease sale upon the environment. Specifically, the Secretary's decision to proceed with the lease sale without delay was based on the *premise* of protective operating orders. This is set forth in the critical letter of the Secretary to the Chairman of CEQ, dated February 17, 1976, advising of his decision to proceed with the sale. He stated his reasons as follows:

The first question we have faced is whether the sale of leases in the Gulf of Alaska should be held now or should be

**51.** Indeed, when appellants suggested, in their comments on the draft EIS, that a fuller evaluation of the Orders was required, BLM responded by simply disclaiming any responsibility for the Orders or for evaluating them:

It is not the responsibility of BLM to establish operating requirements or to supervise OCS operations. The State of Alaska has reviewed the proposed OCS Orders for the Gulf of Alaska published January 6, 1975, and submitted comments. These comments were considered in preparing the Gulf of Alaska Orders which will be issued shortly. Further comments on operating practices should be submitted at that time.

EIS, Vol. III, at 164. The Department of the Interior has overall responsibility both for deciding whether to lease a particular area, and for regulating the manner in which the lessees' operations are conducted. The fact that Interior has chosen to bifurcate that authority between two of its subdivisions obviously cannot affect in any way its responsibility to evaluate fully the environmental impacts of a lease sale.

**52.** The Secretary also argues that the Orders need not be analyzed in an EIS because "they are subject to change and retroactive incorporation into prior leases whenever USGS determines that more stringent standards may be achieved. . . ." Govt. Br. at 47. While this observation is correct, *see* Doremus affidavit, J.A. at 660, we fail to see how the fact that the Orders may someday be changed affects

Interior's obligation to analyze their present environmental impact. Obviously, even a short-lived project may constitute a "major Federal action significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). Indeed, one of the items that must be included in the "detailed statement" on a "major Federal action" is an analysis of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action . . . ." 42 U.S.C. § 4332(2)(C)(v). The clear implication is that the "action" itself need not be "irreversible" in order to require the preparation of an EIS. It is certainly possible that any operations conducted pursuant to the Orders as presently written could entail "irreversible and irretrievable commitments of resources," even if the Orders were later to be amended.

The Intervenors suggest that it "just wouldn't make sense" to require an analysis of the Orders now, since additional analyses might then be required whenever the Orders were amended. Interv. Br. at 58. However, minor modifications of the Orders would presumably not constitute a "major Federal action," and would therefore not require the preparation of a new or updated EIS; and if USGS were to propose a significant amendment of the Orders, we would see nothing "senseless" in a requirement that additional environmental analysis be performed.

delayed for further study and preparation.

We believe that our information on geologic hazards is already sufficient for holding the sale; the U.S. Geological Survey advises me that it has completed analysis of both public and proprietary geophysical data on such hazards, and is professionally satisfied that it now has sufficient knowledge to make recommendations on tracts which should or should not be included. Moreover, in the course of the last few weeks, working in consultation with the Environmental Protection Agency, we have progressed substantially in our drafting of operating orders for the Gulf of Alaska, and we will shortly issue in final form those orders which affect exploratory activity undertaken immediately after leasing.

On the other hand, I must substantially agree with your estimates of the length of the delay that would be necessary to improve significantly our knowledge and readiness in other areas. It will be several years before further biological and oceanographic studies will yield most of their results; and it may be that long or longer before the State of Alaska will accomplish the major legislative and planning steps which it would prefer to have complete before leasing.

It is my considered judgment, based on all these factors, that delays of such length in the lease sale would not gain us enough to be worth the cost in postponement of development of the resources. I am convinced that we already know what the major hazards are in oil and gas development of the Gulf of Alaska; further studies will refine that knowledge but they are unlikely to change it fundamentally. I am further convinced that the operating orders, safety requirements, and lease stipulations developed by the Bureau of Land Management and the U.S. Geological Survey will reduce those hazards to levels which are acceptable.

J.A. at 698–99.

In this context, agency action that might otherwise be viewed as "merely" beneficial to the environment takes on a new cast.

When forthcoming operating orders are expressly viewed by the Secretary as part of the basic premise for the kind of consideration of adverse environmental impact that is mandated by NEPA, then the completion of the undertaking—issuance of protective operating orders—must be conducted with full consideration of environmental consequences and alternatives.

It would not be meaningful to consider at length, at the present time, what kind of discussion of environmental impact of operating orders and alternatives should have been considered either in the EIS for Sale No. 39, or at a subsequent time prior to the sale. The Secretary provided no discussion whatever in the EIS. Yet the district court found that the Secretary, in deciding on February 17, 1976, to proceed with the sale, not only reduced the size of the sale area by forty percent, but "revised the OCS Operating Orders to incorporate in substantial measure the recommendations made by CEQ and EPA. . . ." J.A. at 48. In any case, we must now be concerned with the present, and at the present time there is presumably more information that should be taken into account in any discussion of the environmental impact of the operating orders.

As we have noted, *supra*, an agency's responsibility to evaluate alternatives to a proposed action is governed by a "rule of reason." In this case, that "rule of reason" would require, at a minimum, an evaluation of any reasonable alternative orders put forward by those commenting upon Interior's own proposed orders. However, the "primary responsibility" for carrying out NEPA's mandate rests with the relevant agency, which may not simply "sit back, like an umpire, and resolve adversary contentions" presented to it. *Calvert Cliffs' Coordinating Comm., Inc. v. AEC*, 146 U.S. App.D.C. 33, 43, 449 F.2d 1109, 1119 (1971). *See also Aeschliman v. NRC*, 178 U.S.App. D.C. 325, 330, 547 F.2d 622, 627 (1976), *cert. granted sub nom. Vermont Yankee Nuclear*

*Power Corp. v. NRDC,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977). Accordingly, an analysis limited to the precise orders suggested to Interior might not necessarily fulfill its NEPA responsibilities. The nature and form of environmental analysis required in any given case are matters left to the discretion of the agency involved,[53] and we will therefore not attempt to prescribe how Interior should, on remand, conduct its analysis of the impact of the Orders. We note, however, that one option open to Interior would be to analyze the impact of a *range* of operating orders— it could, in other words, compare each of the Orders promulgated by USGS to relatively more strict and relatively less strict Orders. But whatever the form of the analysis chosen by Interior, the goal must be to provide all those reading the statement with "information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." *NRDC v. Morton, supra,* 148 U.S.App.D.C. at 14, 458 F.2d at 836. *See also Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123, 1136 (5th Cir. 1974).

### C. *Termination Clauses*

■ Appellants argue that the environmental hazards and uncertainties of drilling in the Gulf of Alaska could have been substantially mitigated by the inclusion of "termination clauses" in the leases sold by Interior. As described by the appellants, such clauses would provide that the Secretary could terminate a lease if environmental hazards, unknown or unforeseen at the time of leasing, subsequently arose or were discovered. Appellants contend that the possibility of including such termination clauses in the leases constitutes an "alternative to the proposed action" that should have been considered by the Secretary and evaluated in the EIS. The Secretary contends, however, that he lacks the statutory

authority to include such clauses in the OCS leases, and he therefore concludes that "termination clauses" do not constitute the kind of "alternative" he was obligated to consider.

The Secretary argues that, under the OCS Lands Act, leases may be cancelled *only* where the lessee has been guilty of some wrongdoing—*i. e.,* where the lessee has done (or failed to do) something in violation of the lease's terms, of regulations in effect at the time of the lease's issuance, or of the Act itself. In his view, a termination clause would therefore violate the Act, since it would condition cancellation not on any wrongdoing by the lessee, but rather on the occurrence of some event wholly outside the control of the lessee, namely the discovery of a previously unforeseen environmental hazard. The Secretary bases his interpretation primarily on two specific provisions of the Act. The Act provides that the "issuance and continuance in effect of any lease . . . shall be conditioned upon compliance with the regulations issued under this subchapter and in force and effect on the date of the issuance of the lease . . . ." 43 U.S.C. § 1334(a)(2); and the Act further provides that a lease may be cancelled whenever the lease owner "fails to comply with any of the provisions of this subchapter, or of the lease, or of the regulations issued under this subchapter and in force and effect on the date of the issuance of the lease . . . ." 43 U.S.C. § 1334(b)(1), (2). In the Secretary's view, this cancellation provision was intended by Congress to provide the exclusive means by which a lease might be cancelled.

In our view, this interpretation is inconsistent with other specific provisions of the Act, and with the evident Congressional intent to grant to the Secretary broad discretion in the administration of the OCS leasing program.[54] In charging the Secre-

---

53. *See, e. g., Jones v. District of Columbia Redevelopment Land Agency, supra,* 162 U.S. App.D.C. at 374, 499 F.2d at 510; *SIPI, supra,* 156 U.S.App.D.C. at 408, 481 F.2d at 1092.

54. An agency's interpretation of a statute it is charged with administering is normally entitled to deference from the courts. *Train v. NRDC,* 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731

tary with the administration of the leasing program, the Act gives him "very broad authority, with few guidelines." [55] The Act provides that

(1975); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Such deference is particularly due when the statutory interpretation at issue "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." *Udall v. Tallman, supra* at 16, 85 S.Ct. at 801 (citation omitted). The government argues in its brief that the Secretary has consistently interpreted the Act, since its passage in 1953, to bar the inclusion of "termination clauses" in OCS leases. Govt. Br. at 52. There is, however, no evidence in the record to support this assertion. The only evidence in the record of the Secretary's "long-established position on lease termination," Govt. Br. at 50, n. 25, is an affidavit prepared for this litigation by Stanley Doremus, former Deputy Assistant Secretary of the Interior for Program Development and Budget. J.A. at 703–707. This affidavit is conclusory in tone, and does not even assert that the statutory interpretation in question is "long-established" or dates back to the passage of the Act. While Mr. Doremus states that Interior Department officials have "administered and supervised the OCS leasing program on the understanding that the Secretary . . . does not possess the legal power to terminate such leases," *id.* at 705, he does not explain when, how, or in what context that "understanding" arose. Moreover, as the passage just cited demonstrates, Mr. Doremus consistently blurs the line between two legally distinct questions of statutory authority—*i. e.,* 1) whether the Secretary has the authority to include a termination clause in the OCS leases he offers for sale, and 2) whether he has the much broader authority to cancel a lease even if it does not contain such a clause.

Typically, of course, an agency's statutory interpretation may simply be inferred from the action the agency has taken. *See, e. g., Train v. NRDC, supra,* and *Udall v. Tallman, supra.* Here, however, where the issue is the agency's inchoate, discretionary authority, our task is not so simple—the fact that the agency has chosen not to exercise that authority does not constitute evidence either of a lack of such authority, or even of a "long-established position" that the authority is lacking. *Cf. FTC v. Dean Foods Co.,* 384 U.S. 597, 610, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966); *National Petroleum Refiners Ass'n v. FTC,* 157 U.S.App.D.C. 83, 107, 482 F.2d 672, 696 (1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). Accordingly, where the only evidence of an agency's statutory interpretation is contained in an ambiguous litigation affidavit, prepared some twenty-three years after the enact-

ment of the relevant statute, we conclude that that interpretation is entitled to no special deference.

**55.** H.Rep.No.1084, 94th Cong., 2d Sess. 86 (1976). This Report, prepared by the House's Ad Hoc Select Committee on the OCS, accompanied the proposed OCS Lands Act Amendments of 1976, which would have substantially revised the 1953 Act. As the Report makes clear, it was precisely because of the breadth of the Secretary's discretion under the 1953 Act that the Committee wished to amend the Act. The Report describes the 1953 Act as

> an all too general piece of legislation containing few mandates for the Secretary of the Interior in carrying out his important responsibilities in leasing OCS oil and gas resources. Much of the recent criticism leveled at the Act is based on its lack of specificity.

*Id.* at 50. In a section of the report discussing the "need" for the amendments, the Committee specifically referred to President Nixon's 1974 directive to accelerate leasing on the OCS, see n. 2 *supra,* and noted that this proposal had

> crystallized growing concern on the part of many in Congress and elsewhere about the open-ended authority in the 23-year-old legislation. The existing law gives little guidance to the Secretary of the Interior on how he is to go about leasing OCS lands.

*Id.* at 73–4.

Section 204 of the proposed Act would have empowered the Secretary to "cancel[] . . . any lease . . ., at any time, when it is determined, after hearing, that continued activity pursuant to such lease would cause serious harm or damage" to the environment. The Secretary argues that this proposed amendment "underscores the correctness" of his interpretation of the 1953 Act, since "it demonstrates congressional awareness of the gap in the Secretary's existing authority [with respect to termination clauses]." Govt. Br. at 54. In our view, however, the fact that Congress considered *requiring* OCS leases to be cancellable in no way indicates that the Secretary now lacks the *discretion* to make them cancellable by the inclusion of termination clauses. On the contrary, as we have indicated *supra,* the Committee's goal, in proposing the amendments to the 1953 Act, was to replace the Secretary's broad, largely unregulated discretion with more specific guidelines. Thus, in the Report's comments on § 204 of the proposed Act, the Committee notes that it would amend "Section 5 of the Outer Continental Shelf Lands Act of 1953 by providing *detailed requirements* for the administration of leasing on the OCS." *Id.* at 86 (emphasis added). The Report noted further that

[t]he Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf . . . . Without limiting the generality of the foregoing provisions of this section, the rules and regulations prescribed by the Secretary thereunder may provide for the assignment or relinquishment of leases, for the sale of royalty oil and gas accruing or reserved to the United States at not less than market value, and, in the interest of conservation, for unitization, pooling, drilling agreements, suspension of operations or production, reduction of rentals or royalties, compensatory royalty agreements, subsurface storage of oil or gas in any of said submerged lands, and drilling or other easements necessary for operations or production.

43 U.S.C. § 1334(a)(1). Moreover, the Act specifically provides that leases "shall . . contain such rental provisions and such oth-

er terms and provisions as the Secretary may prescribe at the time of offering the area for lease." 43 U.S.C. § 1337(b)(4).

On its face, this latter provision would clearly seem to grant the Secretary the discretion to include termination clauses in OCS leases, if he wishes to do so; and we find nothing in the Act's legislative history to support a contrary reading. The legislative history contains virtually no discussion of the two provisions upon which the Secretary relies.[56] There is certainly no indication that Congress intended the cancellation provision set forth at 43 U.S.C. § 1334(b)(1), (2), *supra,* to be the exclusive means by which leases might be cancelled. In the absence of any such indication, we believe that the commonsense reading of these provisions is the correct one—*i. e.,* in specifying that the "continuance in effect of any lease . . . *shall* be conditioned upon compliance with" the applicable regulations, 43 U.S.C. § 1334(a)(2) (emphasis added), Congress indicated only that leases *must* be cancellable where the lessee has been guilty of some wrongdoing;[57] but Congress did not thereby indicate that the Secretary and the lessees are precluded from contracting to make the leases cancellable for other reasons as well.[58]

[t]he original subsection (a) of subsection 5 of the OCS Act [43 U.S.C. § 1334(a), quoted in text, *infra* ] granted very broad authority, with few guidelines, to the Secretary to promulgate regulations. The amended subsection, while not limiting the generality of the power granted to the Secretary to promulgate any appropriate regulation, does provide *statutory guidelines and requirements* for certain types of regulations.

*Id.* at 86–7 (emphasis added).

**56.** *See* H.Rep.No.413, 83d Cong., 1st Sess. (1953); *see also* S.Rep.No.411, 83d Cong., 1st Sess. (1953); U.S.Code Cong. & Admin.News 1953, p. 2177.

**57.** The original Senate version of the Act had provided only that "[t]he continuance in effect of any lease . . . *may* be conditioned upon compliance with the regulations prescribed by the Secretary under the provisions of this section." *S.Rep.No.411,* supra n.56 at

24 (emphasis added). The Committee indicated that it had adopted the present mandatory phrasing of this sentence in order to "be[ ] more specific" and to "creat[e] legislative standards." *Id.*

**58.** The Intervenors argue that another provision of the Act, 43 U.S.C. § 1337(b), would also preclude the Secretary from inserting termination clauses in OCS leases. That section provides in pertinent part:

An oil and gas lease issued by the Secretary pursuant to the Section shall . . . (2) be for a period of five years and as long thereafter as oil and gas may be produced from the area in paying quantities, or drilling or well reworking operations as approved by the Secretary are conducted thereon . . .

The Intervenors contend that a termination clause, which would create the *possibility* that a particular OCS lease might have a duration of less than five years, would be inconsistent with

Insofar as we are aware, no other court has addressed the particular question of statutory authority at issue here. However, our statutory interpretation is fully consistent with the limited caselaw dealing with related issues. In *Boesche v. Udall,* 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963), the Supreme Court considered whether the cancellation provision of the Mineral Leasing Act, 30 U.S.C. § 188— which is very similar to the cancellation provision of the OCS Lands Act upon which the Secretary here relies [59]—provided the "exclusive source of the Secretary's power" to terminate a lease issued under the terms of that act. 373 U.S. at 475, 83 S.Ct. at 1375. The Court concluded that it did not. The specific question addressed in the *Boesche* case was whether the Secretary had the authority to cancel in an administrative proceeding a lease that had been granted in violation of the Mineral Leasing Act, even though there had been no wrongdoing on the part of the lessee. The Court noted that the Secretary of the Interior has been vested with "general managerial powers over the public lands," 373 U.S. at 476, 83 S.Ct. at 1376, and it held that these "general powers of management" gave him the authority to cancel a lease invalid at its inception, and that that authority had not been withdrawn by the Mineral Leasing Act. *Id.* at 478–9, 83 S.Ct. 1373.

In reaching this conclusion, the Court pointed out that the Mineral Leasing Act "was intended to expand, not contract, the Secretary's control over the mineral lands of the United States . . .," 373 U.S. at 481, 83 S.Ct. at 1378, and noted that it would be "surprising" to find in the Act a limitation on authority the Secretary already possessed (under his "general managerial powers") to cancel leases issued through administrative error. *Id.* The OCS Lands Act was aimed primarily at resolving questions of federal versus state control over the OCS; like the Mineral Leasing Act; it represented a substantial expansion of the Secretary's authority. Here, too, it would be "surprising" to find in the Act's cancellation provision a limitation on the Secretary's authority to prescribe the terms and conditions that should be included in each lease.[60]

To reiterate, we find only that the Secretary does have the authority, under the specific terms of the Act, as well as under his "general managerial powers over the public lands," to determine what clauses should be included in the OCS leases offered for sale; and *one* of the clauses he may, in his discretion, include in these leases is a "termination clause." We thus need not decide whether the Secretary, as part of his "general managerial powers," has the inherent authority to cancel an OCS lease (even if the lease does *not* contain a termination clause) if he should determine that the public interest requires such action because of the discovery of a previously un-

---

this provision of the Act. We disagree. There is nothing inconsistent about a lease having both a fixed duration and a provision permitting the reduction of that duration in the event of changed conditions. Similarly, of course, where operations on a lease have been suspended, pursuant to § 1334(a)(1) of the Act, the lease term may be *extended* for a comparable period, even though this results in a lease with a duration of *more* than five years. *See Gulf Oil Corp. v. Morton,* 493 F.2d 141 (9th Cir. 1973).

**59.** 30 U.S.C. § 188(a) provides that

[A]ny lease issued under the provisions of this chapter may be forfeited and canceled . . . . whenever the lessee fails to comply with any of the provisions of this chapter, of the lease, or of the general regulations promulgated under this chapter and in force at the date of the lease . . . .

**60.** *See also* 99 Cong.Rec. 10472 (1953). In response to the question whether it was "true that the primary responsibility for laying down the conditions for granting leases is to be in the hands of the Secretary of the Interior, and is not to be delegated or farmed out to the respective State authorities?" Senator Cordon (the OCS Lands Act's sponsor in the Senate) replied: "The bill goes further than that . . . . Not only the primary power, but the absolute and complete power, rests in the Secretary. He is acting for the Federal Government."

foreseen environmental hazard. We note, however, that the Ninth Circuit has concluded that the Secretary does *not* have this sort of inherent cancellation authority. *Union Oil Co. v. Morton,* 512 F.2d 743 (9th Cir. 1975). That court held that "the Secretary . . . has no intrinsic powers of condemnation," *id.* at 750, and that such powers were not conferred "by implication" in the OCS Lands Act. *Id.* While the Secretary has the authority to *suspend* operations on a lease because of an environmental threat, *id.,* an "open-ended suspension", like a lease cancellation, would be equivalent to a "taking." *Id.* at 751. And the court concluded that such a "taking" was not within the Secretary's authority:

> Such a taking by interference with private property rights is within the constitutional power of Congress, subject to payment of compensation. But Congress no more impliedly authorized the Secretary to take the leasehold by prohibiting its beneficial use than by condemnation proceeding. A suspension for which the fifth amendment would require compensation is therefore unauthorized and beyond the Secretary's power.

*Id.* (citation omitted).

The Secretary argues that the statutory construction he advances here is supported, and perhaps compelled, by *Union Oil.* We disagree. Obviously, the mere inclusion of a termination clause in a lease that is being offered for sale could in no way be considered a "taking," since no one is compelled to purchase the lease and to subscribe to its terms. More importantly, if a lease did include a termination clause, and if it were subsequently cancelled in accordance with the terms of that clause, no "tak-

ing" would have occurred. As the *Union Oil* court pointed out, "[a] lease may be terminated by its own terms in the event that stated conditions subsequent occur." *Id.* at 749. OCS leases are inherently risky investments; and since termination clauses could make such investments riskier still, potential lessees might well be unwilling to pay as much for leases with such clauses as they would pay for leases without them. Nonetheless, a lessee who has purchased a lease containing such a clause, and who has paid a reduced price for the lease precisely because it does contain such a clause, could hardly claim that his "property" had been "taken" if at some point in the future his lease were cancelled in accordance with the terms of the clause.[61]

Since we conclude that the Secretary *does* have the authority to include termination clauses in OCS leases, there can be little question that the possibility of including such clauses in the leases at issue here does constitute an "alternative to the proposed action" that should have been evaluated in the EIS and considered by the Secretary.[62] Termination clauses would mitigate the irrevocability of a decision to conduct a lease sale, and would thus reduce, at least to some extent, the risk of proceeding with a sale on the basis of incomplete environmental data. They would therefore have constituted a significant alternative to the options of simply proceeding with the sale or of delaying it pending the receipt of additional data.

We make this declaration in order to provide the declaratory relief requested by the complaint, which is appropriate in light of the omission we have identified. We do not, however, accord to appellants the further relief they have requested, namely,

---

**61.** Compare the discussion in McBride & Wachtel, Government Contracts § 30 (1976) of the government's "inherent" right to cancel contracts into which it has entered, and of the effect of termination clauses in such contracts.

**62.** Even if the Secretary did lack the statutory authority to include termination clauses in OCS

leases, he might still have been required to evaluate this alternative in the EIS. *NRDC v. Morton, supra* at 837. Indeed, since Congress was considering amendments to the OCS Lands Act at the time the EIS was published, see n.55 *supra,* such a discussion would unquestionably have proven helpful.

invalidation of the lease. We turn now to a discussion of appropriate relief.

## III. RELIEF

Appellants urge that the Secretary's failure to comply fully with NEPA requires that the lease sale be set aside as invalid, and that any further drilling in the Gulf of Alaska be enjoined until compliance has been achieved. We conclude, however, that such relief is not required here.

 Government leases issued in violation of the law *may,* in appropriate cases, be invalidated. *See, e. g., Cady v. Morton,* 527 F.2d 786, 798 (9th Cir. 1975); *Boesche v. Udall, supra.* And, as this court has noted, "[i]n most cases, . . . it is possible and reasonable for the courts to insist on strict compliance with NEPA, and actions can, consistently with the public interest, be enjoined until such compliance is forthcoming." *Jones v. District of Columbia Redevelopment Land Agency,* 162 U.S.App.D.C. 366, 377, 499 F.2d 502, 513 (1974). However, while there is, in cases of NEPA noncompliance, a "presumption" in favor of injunctive relief,[63] such relief does not follow automatically from every finding of a violation of NEPA. Rather, where courts have enjoined ongoing projects, they have done so primarily to preserve for the relevant decisionmaker the full opportunity to choose among alternatives that is contemplated by NEPA. By maintaining the *status quo,* while additional environmental studies are performed, or additional alternatives are considered, an injunction ensures that there will be at least a "possibility" that the agency will "change its plans in ways of benefit to the environment. It is this possibility that courts should seek to preserve." *Jones v. District of Columbia Redevelopment Land Agency, supra,* 162 U.S.App.D.C. at 377, 499 F.2d at 513; *Real-*

*ty Income Trust v. Eckerd,* 183 U.S.App. D.C. 426, 435, 564 F.2d 447, 456 (1977). More generally, the purpose of equitable relief, in a NEPA case as in any other, is to *remedy* the particular violations that have taken place; accordingly, where an injunction is not required to preserve the decisionmaker's opportunity to choose, an ongoing project should obviously not be enjoined, especially where, as here, there are substantial public interests in the project's continuation. What is called for, in each case, is a "particularized analysis" of the violations that have occurred, of the possibilities for relief, and of any countervailing considerations of public interest. *Id.*

 Thus, we begin our discussion of the appropriate relief in this case by focusing on the nature of the violations we have found. We found that the Secretary had failed to consider certain alternatives to the proposed federal action—namely, the possibility of including termination clauses in OCS leases, and the possibility of conducting the lease sale pursuant to different, more rigorous operating orders than those promulgated by USGS. Both of these alternatives are only *partial* alternatives to the proposed action. That is, neither of these "alternatives" is, in fact, an alternative to the holding of a lease sale in the Gulf of Alaska OCS; rather, each constitutes a different, presumably less environmentally harmful means of conducting such a sale.[64]

Consequently, adding these two alternatives to the list of alternatives considered by the Secretary could not possibly have led him to reject altogether a lease sale in the Gulf of Alaska, because both of these alternatives expressly *contemplate* such a sale. At most, consideration of these alternatives might have led the Secretary to choose to

63. *Realty Income Trust v. Eckerd,* 183 U.S.App. D.C. 426, 435, 564 F.2d 447, 456 (1977).

64. The fact that these are only partial alternatives does not, of course, relieve the Secretary of the obligation to consider them or to include them in the EIS. *NRDC v. Morton, supra,* 148

U.S.App.D.C. at 14, 458 F.2d at 836; *Aeschliman v. NRC, supra,* 178 U.S.App.D.C. at 332 n.10 at 629 n.10. But it may affect the relief that is called for when, as here, the Secretary has failed to fulfill that obligation.

conduct the sale somewhat differently—*i. e.*, with termination clauses in the leases, or pursuant to different operating orders. To the extent that the Secretary retains the flexibility to protect the environment that these alternatives would have provided, there is simply no need to set the sale aside.

As all parties concede, operating orders may be changed *after* a lease sale has been conducted and may be made effective retroactively upon existing lessees. *See* n.52 *supra*. Consequently, we see no need to set the sale aside while the Secretary conducts the required environmental evaluation of alternative orders; if, after conducting that evaluation, he concludes that the orders promulgated by USGS should be changed, he may change them. Any damage that may have resulted from the exploration that has already been conducted pursuant to the existing orders could not, in any event, be remedied by an injunction. Although continued operations pursuant to the existing orders might conceivably cause some environmental harm during the period in which the Secretary is conducting the

necessary evaluation and is deciding whether to change the orders, that risk is simply too small and too speculative to justify the imposition of an injunction, as long as the Secretary proceeds reasonably expeditiously.[65]

Concerning the inclusion of termination clauses in the leases, the court concludes that it is neither necessary nor appropriate to require the Secretary to consider such an option at this time.[66] A decision to insert the termination clauses now would create grave legal tangles stemming from the impairment in the value of the leases that such modification would undoubtedly cause. Beyond the problem of determining appropriate compensation for this impairment, there is serious question whether the insertion of such clauses might deter some private contractors from pursuing this venture with consequent injury to our energy resource mobilization. If it should eventually develop that the exploration would produce environmental damage that cannot be avoided by a modification of the operating

---

[65]. We note that, for the present, the operations in the Gulf of Alaska are limited to *exploratory* drilling; assuming that oil is discovered during the course of this exploration, it is estimated that large-scale *production* operations, with their correspondingly greater risk of environmental harm, will not commence until June, 1981. Peak oil production operations are not expected to take place before 1986–1987. Kleppe Affidavit, J.A. at 91–92.

We assume that the Secretary can complete the required evaluation and consideration of alternative operating orders prior to the commencement of production operations; if this assumption should prove to be inaccurate, appellants would, of course, be free to seek supplemental relief in the district court.

[66]. Speaking only for himself, the writer of this opinion is of the view that the Secretary should consider the alternative of amending existing leases to include termination clauses. The possible practical drawbacks of this alternative—such as the difficulty of determining compensation and the possibility that some lessees would be deterred from further exploration—should not preclude us from requiring the Secretary to consider it. These are the types of factors the Secretary should take into account in determining whether to adopt an alternative, not rea-

sons to foreclose such a consideration altogether.

Admittedly, the Secretary's authority to adopt this alternative is uncertain. *Cf. Union Oil Co. v. Morton, supra*, discussed at p. 483, *supra*. Moreover, the question of the Secretary's authority to amend the leases in this manner was not addressed by the Secretary or by the parties in their briefs, and should not be decided by this court in the first instance, particularly when there is no guarantee that the Secretary would adopt this option. *Cf. Collins Securities Corp. v. SEC*, 183 U.S.App.D.C. 301, 308, 562 F.2d 820, 827 (1977); *Nassar and Co. v. SEC*, 185 U.S.App.D.C. 125, 566 F.2d 790 (1977) (cases remanded to the agency for initial resolution of questions of statutory interpretation). In any event, the Secretary should consider this alternative, whether or not he has the authority to adopt it. "The mere fact that an alternative requires legislative implementation does not automatically establish it as beyond the domain of what is required for discussion, particularly since NEPA was intended to provide a basis for consideration and choice by the decisionmakers in the legislative as well as the executive branch." *NRDC v. Morton, supra*, . 148 U.S.App.D.C. at 15, 458 F.2d at 837.

orders,[67] or by a suspension of operations,[68] the government would, of course, retain the power to institute formal eminent domain proceedings at that time, to take the leasehold interests.

In conclusion we (a) grant the declaratory relief set forth in section II C *supra,* and (b) remand to the district court, and direct that it remand the case to the Secretary for consideration of alternative operating orders as we have outlined above.

*So ordered.*

---

**67.** As the Second Circuit has recently observed:

[U]nder § 5(a)(1) of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1334(a)(1), the Secretary possesses full power to prescribe "such rules and regulations as may be necessary" to protect the environment from hazards posed by exploitation of the continental shelf. Although a lease may be formally cancellable only for violation of pre-existing regulations, 43 U.S.C. § 1334(b), § 5(a)(1) provides that "The Secretary may at any time prescribe *and amend* such rules and regulations . . . and, *notwithstanding any other provisions herein,* such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter" (emphasis supplied), . . . . [A] willful violation of subsequently-issued regulations would constitute a misdemeanor, 43 U.S.C. § 1334(a)(2), and could provide the basis for injunctive relief. A properly-adopted later regulation would have the force of law, the public interest in compliance would be persuasive in inducing the courts to grant relief, *Virginian Ry. Co. v. System Federation No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937), and the government's control over the seabed and its threatened resources by virtue of the OCS Lands Act, 43 U.S.C. § 1332(a), would give it standing to seek injunctive relief, see *United States v. Ray,* 423 F.2d 16, 22 (5th Cir. 1970).

*County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1381–82 (2d Cir. 1977).

In *County of Suffolk* the court's opinion notes that "the Sale 40 leases provide that each lessee must in its OCS operations comply with the Secretary's regulations as they may be revised or supplemented to provide for prevention of waste, for conservation of the OCS and for protection or correlative rights therein." *Id.* at 1381. We do not readily identify the actual leases that were issued in the Alaska sale in the record before us and have not pursued the matter since it is not central to our opinion. The Second Circuit opinion also indicates that the subsequent regulations would have to be obeyed in any event since their violation would constitute a misdemeanor, 43 U.S.C. § 1334(a)(2).

**68.** *See County of Suffolk, supra* at 1382; *Union Oil Co., supra* at 751–52; *Gulf Oil Corp. v. Morton,* 493 F.2d 141, 144 (9th Cir. 1973). In referring to the possibility of suspension our intent is to take note of a possible authority without purporting to recognize it or define it. However, we do take note that in the *Union Oil* case the Ninth Circuit stated that if operations are suspended indefinitely, property rights have been taken, but that there was authority to promulgate a temporary suspension. The court said:

A suspension whose termination was conditioned on the occurrence of events or the discovery of new knowledge which can be anticipated within a reasonable period of time would be a valid exercise of the Secretary's regulatory power, and not a fifth amendment taking.

512 F.2d at 752.