**CAROLINA ENVIRONMENTAL STUDY GROUP, Petitioner,**

v.

**The UNITED STATES of America and the United States Atomic Energy Commission, Respondents,**

**Duke Power Company, Intervenor.**

**No. 73–1869.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1974.

Decided Jan. 21, 1975.

George S. Daly, Jr., Charlotte, N. C., and Norman B. Smith, Greensboro, N. C., were on the brief for petitioner.

Marcus A. Rowden, Gen. Counsel, Raymond M. Zimmet, Asst. to Sol., Joseph DiStefano, Atty., Atomic Energy Commission, Wallace H. Johnson, Asst. Atty. Gen., Dept. of Justice, Edmund B. Clark and Peter R. Steinland, Attys., Dept. of Justice, were on the brief for respondents.

William H. Grigg, Charlotte, N. C., W. L. Porter, Louisville, Ky., Troy B. Conner, Jr., Joseph B. Knotts, Jr., and J. Michael McGarry, III, Chevy Chase, Md., were on the brief for intervenor.

Before ROBB and WILKEY, Circuit Judges, and MARKEY,* Chief Judge, of the United States Court of Customs and Patent Appeals.

MARKEY, Chief Judge:

This is an appeal under 42 U.S.C. § 2239(b) and 28 U.S.C. § 2342 from a decision of the Atomic Safety & Licensing Appeal Board [Appeal Board] of the Atomic Energy Commission [A.E.C.] which resulted in a final order granting Duke Power Company [Duke] a construction license to build two nuclear reactors for generation of electricity. We affirm.

The two nuclear reactors are of the "pressurized water" type [1] and are to be located on Lake Norman, approximately 17 miles from Charlotte, North Carolina.

Duke's construction application was filed with the A.E.C. in 1970. A public

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. Each unit is scheduled to have a 3,411 megawatt thermal capacity corresponding to an electrical output of 1,180 megawatts.

notice of hearings pursuant to 10 C.F.R. 2.104 was issued. Thereafter, Carolina Environmental Study Group [Study Group] was made a party-intervenor under 10 C.F.R. 2.714. Hearings were held during 1972 and the Atomic Safety & Licensing Board [Board] issued its decision on February 21, 1973, granting the construction licenses sought by Duke. The Appeal Board's June 13, 1973 decision upheld the Board's decision and became the final order of the A.E.C. (10 C.F.R. 2.770). This appeal followed.

The Study Group also filed an action in the District Court for the Western District of North Carolina, seeking to overturn the Appeal Board's decision and raising essentially the contentions raised here. On the A.E.C.'s motion to dismiss for lack of jurisdiction, countered by the Study Group's allegation of jurisdiction under the Administrative Procedure Act (5 U.S.C. § 703), District Judge McMillan stayed the action pending our decision on this appeal.

### THE ISSUES

The Study Group contends that the A.E.C. failed to comply with sections 102(2)(C)(i) and 102(2)(C)(iii) of the National Environmental Policy Act [2] [NEPA] because its Environmental Impact Statement reflects inadequate consideration of the impact of a breach-of-reactor containment accident and the alternatives of no power, other power sources, or the possibility of a decreasing demand for power. Appellant requests that we declare the final order of the A.E.C. illegal and order Duke's construction license stricken.

The Study Group further prays that we remand this action and order proceedings in the District Court in North Carolina because the A.E.C. cannot ac-

cord them "the due process and unbiased consideration to which they are entitled." Appellant alleges that the question of whether construction permits should issue was never truly open because of the A.E.C.'s "bias" in favor of commercial nuclear power development. Appellant points to the A.E.C.'s failure to consider in this and other cases certain environmental factors, its deferral of such consideration until the licensing stage herein, and its allowance of construction exemptions.

### OPINION

### (I) ENVIRONMENTAL IMPACT CONSIDERATION

■ Section 102(2)(C)(i) of NEPA requires a "detailed statement" on "the environmental impact of the proposed action." That language requires description of reasonably foreseeable effects. A "rule of reason" is used to ascertain those effects anticipated. Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972). The "detailed statement" is required as a basis for intelligent balancing of the effect on the environment with the economic and technical factors. Calvert Cliffs Coordinating Committee v. A.E.C., 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). A "finely tuned" balance is envisioned.

The A.E.C. has classified hypothetical reactor accidents from Class 1 (trivial incidents with high occurrence probability) to Class 9 (ultimate severity with occurrence highly unlikely). The Class 9 accident, known as a breach-of-reactor containment accident, involves concurrent rupture of the three-foot thick concrete containment vessel and the several inches of steel surrounding the reactor

---

2. 42 U.S.C. § 4332

The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly af-

fecting the guality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

\* \* \*

core, resulting in the exposure of the radioactive core to the atmosphere. Such an accident would necessarily involve simultaneous malfunction of all safety systems.

The A.E.C.'s Final Environmental Statement, section 7, page 3, included this comment:

> The postulated occurrences in Class 9 involve sequences of successive failures more severe than those required to be considered in the design bases of protective systems and engineered safety features. The consequences could be severe. However, the probability of their occurrence is so small that their environmental risk is extremely low. Defense in depth (multiple physical barriers), quality assurance for design, manufacture and operation, continued surveillance and testing, and conservative design are all applied to provide and maintain the required high degree of assurance that potential accidents in this class are, and will remain, sufficiently small in probability that the environmental risk is extremely low.

What the A.E.C. means by the small probability of such accidents is seen in its report[3] that

> some experts held that numerical estimates of a quantity [of major accidents] so vague and uncertain as the likelihood of occurrence of major reactor accidents have no meaning. They declined to express their feeling about this probability in numbers. Others, though admitting similar uncertainty, nevertheless ventured to express their opinions in numerical terms. Estimations so expressed of the probability of reactor accidents having major effects on the public ranged from a chance of one on 100,000 to one in a billion per year for each large reactor. However, whether numerically expressed or not, there was no disagreement with the

opinion that the probability of major reactor accidents is exceedingly low.

Focusing on the degree of possible damage resulting from the occurrence of a Class 9 accident,[4] the Study Group argues that the risk is very real, thus tending to equate damage with risk. At the same time, the Study Group accuses the A.E.C. of equating probability with risk. We agree with neither equation.

■ The A.E.C. is required by NEPA to set forth the factors involved, to the end that the ultimate decision on a proposed course of action shall be enlightened by prior recognition of its impact on the quality of human environment. Viewing the record as a whole, we cannot say that the A.E.C.'s general consideration of the probabilities and severity of a Class 9 accident amounts to a failure to provide the required detailed statement of its environmental impact. That the probability of a Class 9 accident is remote and that its consequences would be catastrophic are undisputed. Neither the A.E.C.'s finding of low probability, nor its methodology or basis for that finding, are challenged here by appellant.

■ Because each statement on the environmental impact of a proposed action involves educated predictions rather than certainties, it is entirely proper, and necessary, to consider the probabilities as well as the consequences of certain occurrences in ascertaining their environmental impact. There is a point at which the probability of an occurrence may be so low as to render it almost totally unworthy of consideration. Neither we, nor the A.E.C. on this record, would treat lightly the horrible consequences of a Class 9 accident. Recognition of the minimal probability of such an event is not equatable with nonrecognition of its consequences. We find nothing in the instant record which

---

3. A.E.C. report WASH–740 (1957), "Theoretical Possibilities & Consequences of Major Accidents in Large Nuclear Power Plants," page viii.

4. A.E.C. report WASH–740, pg. viii, estimated that a Class 9 accident in a reactor approximately one-seventh the size of one of Duke's reactors would result in up to 3,400 deaths, 43,000 injuries, and $7 billion property damage.

would indicate that the A.E.C. findings regarding Class 9 accidents are clearly erroneous or that 'the A.E.C.'s compliance with NEPA Section 102(2)(C)(i) in this case was inadequate.

## (II) ALTERNATIVES

The Study Group's challenge under NEPA Section 102(2)(C)(iii) is bottomed on the premise that "[i]n the Detailed Statement, an analytically unsound conclusion of an urgent need for power led to short shrift in consideration of alternative means of producing power and no consideration of not producing power."

Duke predicted the area's future need for electrical generating capacity by extrapolating its historic increase in demand for electricity. Although the Study Group takes issue with those predictions, Duke's prior forecasts of future demand have been accurate within 1½% for one year predictions and within 5% for 5 year forecasts. The Study Group has not persuaded us that Duke's predictions or its prediction methodology was irrational.

Notwithstanding Duke's past success with future demand predictions, the Study Group argues that the environmental statement should have discussed at greater length the alternatives of no power, less power, and other means for power generation. Discussing the scope of NEPA's requirement to consider alternatives for proposed action, this court stated in *Calvert Cliffs*, supra, that

> NEPA requires that an agency must—to the *fullest* extent possible under its other statutory obligations—consider alternatives to its actions which would reduce environmental damage. That principle establishes that consideration of environmental matters must be more than a *pro forma* ritual. Clearly, it is pointless to "consider" environmental costs without also seriously considering action to avoid them. (Emphasis in original.)

and further in Natural Resources Defense Council v. Morton, supra, that:

> A sound construction of NEPA * * requires a presentation of the environmental risks incident to *reasonable alternative courses of action*. The agency may limit its discussion of environmental impact to a brief statement, when that is the case, that the alternative course involves no effect on the environment, or · that their effect, briefly described, is simply not significant. A rule of reason is implicit in this aspect of the law. (Emphasis added.)

The Study Group argues that because the nuclear plant is to operate for several decades, alternative power sources which may be developed, such as oil shale, geothermal energy, and solar energy, should have been considered. That contention presupposes future developments which are both speculative developments which are both speculative and remote. Natural Resources Defense Council v. Morton, supra, is dispositive:

> We do not suppose Congress intended an agency to devote itself to extended discussion of the environmental impact of alternatives so remote from reality as to depend on, say, the repeal of the antiturst laws.
>
> In the last analysis, the requirement as to alternatives is subject to a construction of reasonableness, and we say this with full awareness that this approach necessarily has both strengths and weaknesses. Where the environmental aspects of alternatives are readily identifiable by the agency, it is reasonable to state them—for ready reference by those concerned with the consequences of the decision and its alternatives. As already noted, the agency may make references to studies already made by other agencies (including impact statements) or appearing in responsible journals.
>
> There is reason for concluding that NEPA was not meant to require detailed discussion of the environmental effects of "alternatives" put forward in comments when these effects cannot be readily ascertained and the alternatives are deemed only remote and speculative possibilities * * *.

■ The requirement is not to explore every extreme possibility which might be conjectured. Rather, we view NEPA's requirement as one of considering alternatives as they exist and are likely to exist.

The A.E.C.'s environmental statement considered the alternatives of no power, purchased power, and hydroelectric generation and concluded each to be impractical. Of the fossil fuels considered, use of coal was considered most feasible. A detailed discussion of the environmental impact of the use of coal vis-a-vis the use of nuclear reactors was included in the environmental statement. Much of the argument concerning the A.E.C.'s conclusion that in this instance nuclear power is economically superior to coal revolves about the numerical value assigned the "station factor." The "station factor" is a measure of time during which the generating plant is shut down. The Study Group's calculations lead to a figure lower than that reached by Duke and the A.E.C. Accepting the "station factor" most favorable to the Study Group, we find that nuclear generation of power would still result in a substantial yearly saving over coal-generated electricity.

■ We conclude that the A.E.C.'s consideration of alternatives to the proposed action is within the scope of the reasonableness test set forth in Natural Resources Defense Council v. Morton, supra.

## (III) DUE PROCESS

■ The Study Group maintains that because the A.E.C. Act places responsibility for the encouragement of peaceful uses of atomic energy upon the A.E.C., the agency has displayed a promotional bias favoring use of atomic energy over its reasonable regulation as glossed by NEPA. The possibility of such a conflict of interests is obvious. However, the record does not indicate that such a conflict occurred or blinded the A.E.C.'s judgment herein. Nor does the record suggest a failure to give the Study Group "the due process and unbiased consideration to which they are entitled."

■ Agencies are required to consider in good faith, and to objectively evaluate, arguments presented to them; agency officials, however, need not be subjectively impartial. Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289 (8th Cir. 1972). The challenged actions of the A.E.C. herein were neither arbitrary nor capricious and would appear to be good-faith attempts to hear all interested parties and to fairly respond to all arguments.

Opportunity was afforded other interested agencies and groups to present their views in order to obtain a full and accurate disclosure of information required by NEPA. Some seventeen federal, state, and local agencies submitted comments on the Draft Environmental Statement, the texts of the comments appearing as appendices to the Final Environmental Statement. Earlier, the Study Group was afforded opportunity, during hearings before the Board, to present its views and evidence relating to the contested issues.

The three specific subsidiary actions of the A.E.C. (failure to consider certain factors; deferral of considerations until the licensing stage; grant of construction exemptions) are not seen by us as illustrative of or as tainted by agency bias. The Study Group was not denied the opportunity to be heard, either directly or through the rule-making procedure by which the action was taken, in relation to any of these subsidiary actions. We find nothing in the record to suggest that the Study Group was denied the "fair play" that due process requires. Appellant's request for remand is accordingly denied.

For all of the foregoing reasons, the decision of the A.E.C. is affirmed.

Affirmed.