**NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,**

v.

**UNITED STATES NUCLEAR REGULATORY COMMISSION, Respondent.**

**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.**

v.

**Robert C. SEAMANS, Jr., et al., Appellants.**

**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Appellants,**

v.

**Robert C. SEAMANS, Jr., etc.**

**Nos. 77–1489, 78–1576 and 78–1698.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 2, 1979.

Decided Aug. 17, 1979.

---

**45.** We repeat that we express no opinion as to whether plaintiff will be able to prove his case at trial.

Ronald J. Wilson, Washington, D.C., with whom Barbara B. Graham, Washington, D. C., was on the brief, for petitioner/appellant Natural Resources Defense Council in Nos. 77–1489 & 78–1698 and appellee in No. 78–1576.

Jacques B. Gelin, Atty., Dept. of Justice, and Mark E. Chopko, Atty., Nuclear Regulatory Commission, Washington, D. C., a member of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave

of court, with whom James W. Moorman, Asst. Atty. Gen., Dept. of Justice, Guy H. Cunningham, III, Acting Asst. Gen. Counsel, Department of Energy, Stephen F. Eilperin, Solicitor, Nuclear Regulatory Commission, William M. Cohen and Carl Strass, Attys., Dept. of Justice, Washington, D. C., were on the briefs, for respondent/appellees in Nos. 77–1489 and 78–1698 and cross-appellants in No. 78–1576.

Edmund B. Clark and Larry A. Boggs, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent in No. 77–1489. Sanford Sagalkin, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellants in No. 78–1576.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

This case concerns the construction of twenty-two tanks for the storage of high-level radioactive waste by the Energy Research and Development Administration (ERDA) at the Hanford Reservation in Richland, Washington, and the Savannah River Plant in Aiken, South Carolina. We decide whether the Nuclear Regulatory Commission (NRC or Commission) must license these tanks under section 202(4) of the Energy Reorganization Act of 1974, 42 U.S.C. § 5842(4) (1976), and whether ERDA must prepare an environmental impact statement (EIS) for the tanks under section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C) (1976).

## I. LICENSING

Congress authorized funds for the construction of the twenty-two tanks in appropriations acts for fiscal years 1976 and 1977.[1] The tanks are intended for storage

---

1. The fiscal year (FY) 1976 project for Savannah River, No. 76–8–a, and the FY 1976 project for Hanford, No. 76–8–b, are specifically autho-

rized in Pub.L.No.94–187, § 101(b)(8), 89 Stat. 1066 (1975). The FY 1977 project for Savannah River, No. 77–13–d, and the FY 1977

of nuclear wastes generated by ERDA's nuclear weapons materials production program. *See* S.Rep.No.94–762, 94th Cong., 2d Sess. 37 (1976); H.R.Rep.No.94–1081 (Part I), 94th Cong., 2d Sess. 35–36, 43 (1976);[2] H.R.Rep.No.94–696, 94th Cong., 1st Sess. 4–5, 74–75 (1975) (Conference Report). Under section 202(4) of the Energy Reorganization Act of 1974, NRC must license ERDA facilities "authorized for the express purpose of subsequent long-term storage of high-level radioactive waste generated by [ERDA], which are not used for, or are part of, research and development activities."[3] In August 1975, the Natural Resources Defense Council, Inc. (NRDC) requested ERDA to obtain a construction permit from NRC for the waste storage tanks. NRDC also requested NRC to assert its licensing authority.

In February 1976, ERDA advised NRDC that a license was unnecessary because the tanks were intended only for short-term storage. In September of that year, NRC advised NRDC that the tanks were not subject to its jurisdiction. NRDC sought review of both agencies' actions in the District Court for the District of Columbia and requested injunctive and declaratory relief.[4] Specifically, NRDC sought a declaratory judgment that ERDA was required to ob-

tain a license from NRC under section 202(4), and that NRC erred in refusing to assert licensing jurisdiction over the tanks.[5] While the case was pending in the district court, NRC issued a formal memorandum and order ruling that the tanks authorized for fiscal years 1976 and 1977 are beyond the scope of its jurisdiction under section 202(4).[6]

The district court, in a memorandum opinion, denied the agencies' motion to dismiss for lack of jurisdiction,[7] and reviewed the merits of ERDA's and NRC's section 202(4) decisions. The court held on motions for summary judgment that the tanks were not "authorized for the express purpose of subsequent long-term storage" and thus are not subject to the license requirement of section 202(4).[8]

*A. District Court's Jurisdiction*

■ At the outset, NRC argues that the district court lacked jurisdiction to review its decision. NRC relies on 28 U.S.C. § 2342(4) (1976) and section 189 of the Atomic Energy Act of 1954, 42 U.S.C. § 2239 (1976), for the proposition that its order is reviewable only in the courts of appeals. Under these statutes, the courts of appeals have exclusive jurisdiction to en-

project for Hanford, No. 77–13–e, are specifically authorized in the Conference Report of the 94th Congress, H.R.Rep.No.94–1718, 94th Cong., 2d Sess. 11 (1976), which led to the FY 1977 appropriations legislation for ERDA, Pub. L.No.95–183, Title I, 91 Stat. 1375 (1977). *See* S.Rep.No.95–212, 95th Cong., 1st Sess. 11 (1977). *See also* Pub.L.No.95–3, § 3, 91 Stat. 11 (1977); Pub.L.No.94–355, Title I, 90 Stat. 889 (1976).

2. The 94th Congress failed to complete appropriations legislation for ERDA for FY 1977. Legislation covering FY 1977 was enacted in the 95th Congress, which approved the same projects that were the subject of the prior Congress's reports. *See* S.Rep.No.95–212, *supra* note 1, at 11. We therefore refer to the 94th Congress reports in construing the FY 1977 appropriations legislation.

3. 42 U.S.C. § 5842(4) (1976) also grants NRC licensing jurisdiction over "Retrievable Surface Storage Facilities." NRDC does not contend that the tanks are such facilities.

4. *See* Joint Appendix (J.A.) at 1–37 (amended complaint filed Nov. 5, 1976).

5. *Id.* at 34–35. NRDC alleged that ERDA violated section 202(4) in Count I of its complaint and alleged that NRC violated that section in Count III. NRDC sought an injunction against the defendants enjoining construction of the tanks until a license was granted. Count II of the complaint pertains to ERDA's failure to file an EIS for the tanks under section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1976). *See* text *infra* at ——–—— of 196 U.S.App.D.C., at 1268–1272 of 606 F.2d.

6. J.A. at 107–15 (In re Request of NRDC Concerning ERDA High Level Waste Storage Facilities, Memorandum and Order filed Mar. 31, 1977).

7. J.A. at 181–83. The agencies moved to dismiss Counts I and III of the complaint. *See* note 5 *supra*.

8. *Id.* at 183–91.

join, set aside, suspend (in whole or in part), or determine the validity of all final orders of NRC entered in any proceeding for the granting, suspending, revoking, or amending of any license.[9]

There is no dispute that NRC's decision constitutes a "final order" under 28 U.S.C. § 2342 and 42 U.S.C. § 2239. The question is whether the order was "entered in a proceeding" for "the granting . . . of any license." 42 U.S.C. § 2239. NRDC asserts that the order was not entered in such a proceeding because no license application was pending before the Commission. The district court adopted essentially this position.[10] NRC counters that the order is within 42 U.S.C. § 2239 because it was entered in a proceeding to determine whether a specific project fell within the scope of NRC licensing authority.

We conclude that NRC's decision concerning jurisdiction over particular tanks is well within the class of final orders reviewable under 28 U.S.C. § 2342 and 42 U.S.C. § 2239.[11] In the circumstances of this case,

the absence of an application for a license is not dispositive. Since a licensing jurisdiction determination is a necessary first step in any proceeding for the granting of a license, we hold that NRC's decision was "entered in a proceeding" for "the granting . . . of any license."

Furthermore, exclusive jurisdiction in the courts of appeals over such orders will eliminate unnecessary duplicative review and the delay and expense incidental thereto. As long as we have an administrative record on which to base our review, as we do here, there is no need for evidentiary hearings in the district court.[12] *See generally Investment Co. Institute v. Federal Reserve System*, 179 U.S.App.D.C. 311, 317, 320–322, 551 F.2d 1270, 1276, 1279–81 (1977). In this case, NRC solicited the comments of ERDA and NRC staff in acting upon NRDC's request for a decision on its licensing jurisdiction over the tanks. The Commission considered over 300 pages of correspondence and submissions from these sources and from NRDC. NRC assessed the issue be-

9. The quoted review statutes refer to the Atomic Energy Commission, which has been abolished and whose functions have been transferred in large part to NRC and ERDA. *See* 42 U.S.C. §§ 5814, 5841(f) (1976). Under 42 U.S.C. § 5871(g) (1976), final orders entered by NRC in the performance of functions transferred from the Atomic Energy Commission, such as licensing functions, are reviewable as if they had been made by the Atomic Energy Commission.

10. The district court referred to NRC's failure to apply regulations governing action on applications for licenses. Specifically, the district court cited 10 C.F.R. §§ 2.100–.108 (1977), which set out procedures for filing of applications, administrative review of applications, hearings on applications, notice of proposed action on applications, notice of issuance of licenses, withdrawal, and denial of applications.

11. NRDC argues that the legislative history of section 2239 and established case precedent support a contrary view. We disagree. The original version of section 189 of the Atomic Energy Act, as introduced, provided for exclusive review by the courts of appeals of "[a]ny final order granting, denying, suspending, revoking, modifying, or rescinding any license." H.R.Rep.No.2181, 83d Cong., 2d Sess. 6, 85 (1954); S.Rep.No.1699, 83d Cong., 2d Sess. 6, 85, *reprinted in* [1954] U.S.Code Cong. & Ad-

min.News 3456. The provision was later amended to provide for exclusive review of "[a]ny final order entered in any proceeding" for "the granting, suspending, revoking, or amending of any license." H.R.Rep.No.2666, 83d Cong., 2d Sess. 40 (Conference Report), *reprinted in* [1954] U.S.Code Cong. & Admin. News 3456. *See also* 100 Cong.Rec. 10685–86 (1954). Our interpretation is fully consistent with this history.

The cases cited by NRDC are easily distinguishable. In *Citizens for a Safe Environment v. AEC*, 489 F.2d 1018, 1021–22 (3d Cir. 1974), the court held there was no "final order" under 42 U.S.C. § 2239(a) on which to base jurisdiction in the courts of appeals. In *Izaak Walton League v. Schlesinger*, 337 F.Supp. 287, 291–93 (D.D.C.1971), the district court held it had jurisdiction to review NRC's failure to issue an EIS, notwithstanding the pendency of a license application before the Commission, because under the particular facts of the case, review in the court of appeals would be either inadequate or unavailable.

12. If further factual development is necessary in a given case, the court of appeals could remand to the agency for appropriate proceedings. *See Investment Co. Inst. v. Federal Reserve Sys.*, 179 U.S.App.D.C. 311, 321 & n.9, 551 F.2d 1270, 1280 & n.9 (1977).

fore it and ruled that statutory language and congressional intent precluded assertion of licensing jurisdiction over the tanks under section 202(4).

■ For the foregoing reasons, we hold that exclusive jurisdiction to review NRC's determination rests in the courts of appeals. The district court erred in reviewing NRC's licensing decision on the merits.[13] We therefore review NRC's determination directly rather than via the decision of the district court.[14]

**B.** *Section 202(4) of the Energy Reorganization Act of 1974*

■ The crucial question in determining whether the tanks at Hanford and Savannah River are within NRC's licensing authority is whether they are "authorized for the express purpose of subsequent long-term storage of high-level radioactive waste" generated by ERDA.[15] 42 U.S.C. § 5842(4). NRDC contends that resolution of this question turns on the likelihood that the tanks will be used for long-term storage, rather than whether Congress or ERDA actually authorized them for that purpose. ERDA consistently has treated the tanks as part of its short-term waste management program.

Legislative history assists us in our review. The Energy Reorganization Act of 1974 abolished the Atomic Energy Commission and established ERDA and NRC as distinct, independent agencies within the executive branch. *See* S.Rep.No.93–980, 93d Cong., 2d Sess. 1–2, *reprinted in* [1974] U.S.Code Cong. & Admin.News 5470. Congressional desire to separate the developmental and promotional functions from

the licensing and regulatory functions of the Atomic Energy Commission impelled this action. Congress, for the most part, placed the former functions in ERDA and the latter in NRC. *See id.* at 2, 24; H.R. Rep.No.93–707, 93d Cong., 1st Sess. 2 (1973). In so doing, Congress gave ERDA responsibility for insuring that its programs are environmentally sound and not adverse to public health and safety. The Senate Committee on Government Operations stated:

> The committee also intends that the Assistant Administrator for Environment and Safety should have an inspection and audit function which reaches throughout ERDA to ensure the establishment and enforcement of appropriate health, public safety and environmental protection standards for all activities of the agency. Such a function is especially imperative in the noncommercial nuclear R. & D. area because the [NRC] will have no licensing jurisdiction over such ERDA nuclear activities.

S.Rep.No.93–980, *supra* at 30, *reprinted in* [1974] U.S.Code Cong. & Admin.News 5492; see 42 U.S.C. § 5812(d) (1976) (establishing Office of ERDA Assistant Administrator for Environment and Safety).

Notwithstanding the general exemption of ERDA programs from NRC licensing authority, Congress enacted section 202 of the Energy Reorganization Act of 1974, which gives NRC licensing and related regulatory authority over certain ERDA reactors and waste storage facilities. Congress intended to enable NRC "to develop early expertise in new generations of nuclear technology as they approach commercial application." S.Rep.No.93–980, *supra* at 59,

---

**13.** To the extent that the district court's decision grants summary judgment on Count III of NRDC's complaint, the decision is vacated.

There is no special statutory review proceeding applicable to ERDA's decisions in this case. Consequently, the district court had authority to review ERDA's decisions in accordance with the "nonstatutory" review provisions, sections 10(a) and 10(b), of the Administrative Procedure Act, 5 U.S.C. §§ 702, 703 (1976). *See generally City of Rochester v. Bond,* 195 U.S. App.D.C. 345, at 349–350, 352–353, 603 F.2d 927, 931–932, 934–935 (D.C.Cir. 1979). Thus,

while the district court lacked jurisdiction to review NRC's interpretation of section 202(4), it did have jurisdiction to review ERDA's assessment of its licensing obligation under section 202(4).

**14.** NRDC, although contending that the district court had jurisdiction to review NRC's order, also filed a "protective" petition for review in this court.

**15.** *See* J.A. at 110–11, 184.

*reprinted in* [1974] U.S.Code Cong. & Admin.News 5520. The Senate Committee explained that sections 202(3) [16] and (4)

> provide [NRC] the authority and responsibility for licensing and related regulation of retrievable surface storage facilities and other facilities for high-level radioactive wastes which are or may be authorized by the Congress to be built by ERDA or with ERDA financial assistance for long-term (tens to hundreds of years) storage of such radioactive wastes generated by the Administration or to which present high-level radioactive wastes may be transferred by the Administration in the future. It is not the intent of the committee to require licensing of such storage facilities which are already in existence or of storage facilities which are necessary for the short-term storage of radioactive materials incidental to ERDA's R. & D. activities.
>
> These two paragraphs anticipate the time, probably in the 1980's, when commercial nuclear power reactors will generate more high-level radioactive waste materials than reactors in the Government sector, including those used in the weapons program. At present, most of the wastes which are leaking from temporary tanks in AEC storage facilities are from the weapons programs. The committee intends that new facilities now being planned for long-term storage of commercial wastes will meet the strict licensing standards of [NRC].

*Id.* at 59–60, *reprinted in* [1974] U.S.Code Cong. & Admin.News 5521; *see* H.R.Rep. No.93–1445, 93d Cong., 2d Sess. 33–34 (Conference Report), *reprinted in* [1974] U.S. Code Cong. & Admin.News, p. 5470 (facilities for long-term storage of wastes, including wastes from licensed sector, not now in existence but will be developed in near future).

The words of section 202(4), coupled with the foregoing legislative history, convince us that NRDC's interpretation of that section is erroneous. Had Congress desired to base NRC licensing jurisdiction on a factual determination of the probability that particular ERDA waste storage facilities would, for reasons of necessity or otherwise, be used for long-term storage,[17] it would have enacted a statute significantly different from that before us. Instead, Congress chose to give NRC licensing jurisdiction when such facilities are "authorized for the express purpose of subsequent long-term storage." 42 U.S.C. § 5842(4). Although the parties suggest that some ambiguity exists concerning *who* must give the required authorization—Congress or ERDA—neither authorized the twenty-two tanks for long-term storage.[18]

With respect to the fiscal year 1976 tanks, ERDA advised members of Congress that it expected "to use the planned tanks only until ERDA can implement an approved plan for long-term storage of the wastes. It is presently anticipated that facilities for long-term storage will be available between 15 and 20 years after construction of the tanks in question has been completed." H.R.Rep.No.94–696, 94th Cong., 1st Sess. 77 (1975) (letter from ERDA reprinted in Conference Report). Congress agreed that "these facilities for short-term [storage] of radioactive waste are not required to be licensed by the [NRC]." *Id.* at 75. In addition, Congress explained:

> This does not, of course, reduce in any way the responsibility of ERDA to assure that all storage of radioactive waste must be completely acceptable from the standpoint of the public health and safety and the protection of the environment. The

---

**16.** Under section 202(3), NRC has licensing jurisdiction over high-level radioactive waste storage facilities of commercial licensees.

**17.** NRDC argues that in such a determination, long-term storage would be storage longer than twenty years. Our resolution of the licensing issue renders consideration of this issue unnecessary.

**18.** NRDC does not challenge the sincerity of Congress's or ERDA's intentions that these tanks will be used for short-term storage. ERDA stated that it will inform NRC of any changes in plans for the tanks. *See* J.A. at 108–09.

Joint Committee expects the Administration to make timely plans for the permanent storage of the wastes which will be contained in these tanks.

*Id.*

The fiscal year 1977 tanks are of the same design as the 1976 tanks, and ERDA consistently has maintained that they too are part of its short-term waste storage program. *See* J.A. at 113, 115 (Memorandum and Order of NRC, filed March 31, 1977). Nothing indicates that either ERDA or Congress authorized the fiscal year 1977 tanks for the express purpose of long-term storage. In approving the Hanford and Savannah projects for 1977, the congressional committees stated:

> The Weapons Materials Production (Special Materials Production) program is primarily associated with the production of special nuclear materials for weapons; the reprocessing of naval fuels; and the safe management of ERDA radioactive waste products. . . . The radioactive waste products are processed and isolated in storage tanks or other on-site storage facilities. Research is also being conducted on alternatives for ultimate waste disposal.

> .     .     .     .     .

> With respect to management of radioactive wastes produced by ERDA operations, the committee notes with approval that the agency is planning to significantly intensify its efforts to . . . develop methods for their permanent disposal.

H.R.Rep.No.94–1081 (Part I), *supra* at 35–36; S.Rep.No.94–762, 94th Cong., 2d Sess. 37 (1976). Further, the congressional committees explicitly recognized the research underway to develop a long-term waste storage technique, and the committees

planned to monitor developments toward that end during fiscal year 1977. *See* H.R. Rep.No.94–1081 (Part I), *supra* at 12–14. *See also* H.R.Rep.No.94–699, *supra* at 77.

In sum, nothing in the language or legislative history of section 202(4) of the Energy Reorganization Act of 1974 supports NRDC's interpretation of that section. Because neither ERDA nor Congress authorized the fiscal years 1976 or 1977 tanks for long-term storage, we conclude that they are not within the licensing authority of NRC.

## II.  NEPA

*A.  Background*

■ A Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), directs government agencies "to the fullest extent possible" to

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

> (i) the environmental impact of the proposed action, [and]

> .     .     .     .     .

> (iii) alternatives to the proposed action.

NRDC contends that ERDA violated NEPA by failing to prepare an EIS on the tank projects at Hanford and Savannah River for fiscal years 1976 and 1977. NRDC is concerned with ERDA's failure to discuss alternatives to the planned tanks. Specifically, NRDC contends that ERDA should have considered specific design and safety features that could be incorporated in the tanks [19] as well as a different tank

---

**19.** The design and safety features advocated by NRDC are:

thicker and more chemically resistant steel plates, an impressed current cathodic protection system to guard against stress corrosion cracking, better waste retrieval equipment and enlarged tank openings to facilitate retrieval, and cooling coils like those at Savannah River, for the tanks at Hanford.

Brief for NRDC at 24. These alternatives were raised by NRDC in an August 7, 1975, letter to ERDA (Exh. 41). Some of the same suggestions were contained in a technical study on the FY 1974 tanks by ERDA's construction contractor. *See* J.A. at 149.

type and storage technique.[20] NRDC argues that these alternatives would enhance the durability of the tanks and would facilitate retrieval of wastes at the end of the tanks' useful life.

ERDA does not dispute that the tanks are a "major Federal action" within the meaning of section 102(2)(C) of NEPA.[21] It contends instead that NRDC did not raise alternatives in the proper manner, and that, in any event, the EISs on its overall waste management programs at Hanford and Savannah River were adequate.[22]

The district court held that NEPA requires ERDA to discuss reasonable design and safety features that could be incorporated in the proposed tanks and that NRDC had proposed focused and seemingly feasible alternatives.[23] The court ordered ERDA to consult with NRDC and either submit a timetable for preparing an EIS or explain why discussion of the alternatives was unwarranted.[24] This court vacated those procedural requirements.[25]

The district court also decided that NEPA required ERDA to discuss the impact of an alternative tank type and storage technique on "long-term planning and decisionmaking."[26] In the court's view, ERDA should assess "in . . . depth the relative durability and retrievability of the [stainless steel tank/calcinated acid waste] system as compared with the present system."[27] The court ordered ERDA to submit a timetable for preparation of an appropriate EIS. This court vacated that procedural requirement as well.[28]

## B. *Analysis*

NEPA requires proposals for major federal action significantly affecting the quality of the environment to be accompanied by detailed discussion of the reasonably foreseeable effects on the environment of reasonable alternative courses of action. *See Carolina Environmental Study Group v. United States,* 166 U.S.App.D.C. 416, 418–421, 510 F.2d 796, 798–801 (1975). *See also NRDC v. Morton,* 148 U.S.App.D.C. 5, 12, 458 F.2d 827, 834, 837–38 (1972) (Leventhal, J.), *cited with approval in Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *id.,* at 24, 458 F.2d at 846 (MacKinnon, J., dissenting); 40 C.F.R. § 1500.8(a)(4) (1978) (EIS should include "alternatives related to different designs or details of the proposed action which would present different environmental impacts"); 10 C.F.R.

---

**20.** The alternative tank type and storage technique mentioned consisted of stainless steel tanks and calcinated acid-waste storage, such as that used by ERDA at the Idaho National Engineering Laboratory. *Id.* at 204A–205.

**21.** ERDA issued "Negative Declarations" under NEPA for the tanks. *See* 41 Fed.Reg. 48398 (1976) (FY 77—Savannah River); 41 Fed.Reg. 38209 (1976) (FY 77—Hanford); 40 Fed.Reg. 22166 (1975) (FY 76—Savannah River); 40 Fed.Reg. 22165 (FY 76—Hanford). Although ERDA originally asserted that the FY 1976 tanks would not significantly affect the quality of the human environment, it abandoned that contention before the district court. *See* J.A. at 192 & n.12.

**22.** *See* Final Environmental Impact Statement, Waste Management Operations, Savannah River Plant, Aiken, South Carolina (ERDA–1537) (Sept.1977) (Exh. 95; Final Environmental Impact Statement, Waste Management Operations, Hanford Reservation, Richland, Washington (ERDA—1538) (Dec.1975) (Exh. 39).

**23.** J.A. at 199 -204A.

**24.** *Id.* at 204A–205, 211–12. The district court stated it could not assess ERDA's decision not to discuss the safety and design alternatives without an explanation from the agency. *Id.* at 209.

**25.** On consideration of a motion for stay of mandate pending appeal, this court denied the motion and *sua sponte* ordered "those portions of the [d]istrict [c]ourt's order requiring [ERDA] to submit a timetable for the ordered [EIS] . . . and to consult with [NRC] thereon" vacated. *NRDC v. Seamans,* No. 78–1576 (D.C.Cir. July 26, 1978). *See generally Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 550, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). This court did not rule on the substantive findings of the district court which are the subject of the present appeal.

**26.** J.A. at 209.

**27.** *Id.* at 208.

**28.** *See* note 25 *supra.*

§ 711.83(d)(9) (1978) (same). An EIS allows an agency to evaluate the risks of a proposal in light of the risks of alternatives. If, as the district court found,[29] the alternatives advocated by NRDC were reasonable, ERDA, when it proposed the tanks, should have prepared an EIS which considered the reasonably foreseeable environmental effects of the alternatives. *See Kleppe v. Sierra Club*, 427 U.S. 390, 405–06, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). We have no reason to disturb the district court's decision that the suggested alternatives were reasonable. ERDA does not argue to the contrary and, in fact, bases its appeal on other grounds.

### 1. Safety and Design Alternatives

■■■ ERDA argues NRDC waived its right to have safety and design alternatives considered by failing to present them during proceedings on the EISs for ERDA's overall waste management operations at Hanford and Savannah River. The issuance of a draft EIS on the Hanford program was announced in September 1974, and hearings were held in early 1975.[30] NRDC participated but did not recommend safety and design features to be incorporated in ERDA tanks. The announcement of a draft EIS on the Savannah River program was made in October 1976.[31] NRDC did not comment. ERDA adopted the final EIS for Hanford in December 1975, and the final EIS for Savannah River in September 1977.

NRDC contends that, although it did not raise the design and safety features during proceedings on the "programmatic" EISs,[32] it appropriately alerted ERDA in a letter sent in August 1975. In that letter, NRDC set out the suggested alternatives[33] and explained the need for further discussion in specific EISs:

**29.** *See* J.A. at 203, 207.

**30.** *Id.* at 66.

**31.** *Id.*

**32.** In general, a "programmatic" EIS analyzes alternatives to, and overall effects of, a broad agency program. A "site-specific" or "project-specific" EIS focuses on particular facilities.

The programmatic EIS on [Savannah River's] and Hanford's waste management programs simply cannot provide *detailed* analysis of the important specific environmental issues involved. Moreover, neither of these EIS[s] have been issued in final form yet. Of course, reliance on these documents for issues that *are* discussed therein would be appropriate. But they cannot replace the need for individual project EIS[s] when there are significant and important project-specific environmental issues. CEQ guidelines specifically state that:

> "Subsequent statements on major individual actions will be necessary where such actions have significant environmental impacts not adequately evaluated in the program statement." 40 C.F.R. § 1500.6(d)(1).

Exh. 41, at 7. We find that NRDC, in its August 1975 letter, fairly presented potential tank alterations to ERDA. The issue is whether NRDC should have raised these alternatives in proceedings on the programmatic EISs.

The programmatic EISs primarily focus on alternatives to ERDA's overall waste management operations, rather than on alternatives to particular facilities encompassed within those operations. For example, ERDA discussed the following alternatives in the Hanford programmatic EIS: continuing the present program of converting liquid waste to a salt cake form; decommissioning Hanford's waste generating facilities; and discontinuing the salt cake solidification system and either (1) holding the liquid waste until an ultimate disposal method is available or (2) converting the waste to a better solid form. *See* Final Environmental Impact Statement, Waste Management Operations, Hanford Reservation, Richland, Washington at V–1 to V–10

*See Scientists' Inst. for Pub. Information v. AEC*, 156 U.S.App.D.C. 395, 402–404, 481 F.2d 1079, 1086–88 (1973). *See generally Kleppe v. Sierra Club*, 427 U.S. 390, 412–15, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

**33.** *See* note 19 *supra*.

(ERDA–1538) (Dec.1975) (Exh. 39A).[34] The alternatives ERDA discussed in the Savannah River programmatic EIS included: storing no additional wastes onsite; restoring waste management areas to their original conditions; continuing present practices without improvements; and maintaining existing operations with continuing improvements in policies and standards. *See* Final Environmental Impact Statement, Waste Management Operations, Savannah River Plant, Aiken, South Carolina at V–1 to V–15 (ERDA–1537) (Sept.1977) (Exh. 95).

The broad alternatives and related environmental consequences discussed in the EISs on ERDA's overall waste management programs vastly differed, in both quality and quantity,[35] from the safety and design alternatives to specific waste tanks presented in NRDC's letter. *See generally Scientists' Institute for Public Information v. AEC*, 156 U.S.App.D.C. 395, 409, 481 F.2d 1079, 1093 (1973). NRDC could not have been expected to attempt to shift the programmatic thrust of ERDA's EISs by presenting alternatives for particular facilities in the specific program adopted.[36] We therefore conclude that NRDC was not required to submit the safety and design features during the programmatic proceeding.

ERDA also argues that the EISs on the waste management operations at Hanford and Savannah River satisfy its NEPA responsibilities with respect to the tanks. We cannot agree. Those EISs did not discuss safety and design features that could be incorporated in waste storage tanks. The tanks for fiscal years 1976 and 1977 themselves were "major Federal actions" under NEPA, which warranted discussion of reasonable alternatives.[37] ERDA, in its discretion, could have chosen to explore alternatives to the particular tanks in either a "programmatic" or "site-specific"[38] format. *See Scientists' Institute for Public Information v. AEC*, 156 U.S.App.D.C. at 408, 481 F.2d at 1092. However, the EISs ERDA prepared, which were devoted to program level issues, did not relieve it of the obligation to discuss alternatives to particular tanks prior to adopting a tank proposal.

### 2. Alternative Tank Type and Storage Technique

The district court decided that ERDA must prepare an EIS discussing an alternative waste storage system involving

---

**34.** NRDC's recommendation on the Hanford program EIS was for ERDA to take three steps: (1) engage in a high-level waste tank construction program; (2) end further reprocessing; and (3) end deliberate release of significantly radioactive waste to the soil. Final Environmental Impact Statement (ERDA–1538), *supra* note 22, at X–204.

**35.** *See* note 32 *supra*.

**36.** We reject ERDA's contention that a civil action brought by NRDC in 1973 to compel preparation of an EIS for the Hanford waste management program bars this action on the basis of *res judicata*. In this case, NRDC does not challenge the adequacy of the programmatic EIS for Hanford; rather, it challenges ERDA's failure to prepare EISs for the FY 1975 and 1976 storage tanks authorized for Hanford and Savannah River. The causes of action are different and *res judicata* does not apply.

**37.** In *Save our Sycamore v. Metropolitan Atlanta Rapid Transit Auth.*, 576 F.2d 573, 576 (5th Cir. 1978) (per curiam), the Fifth Circuit stated:

As we interpret the district court opinion, it does not suggest that an EIS of proper scope is necessarily an EIS of sufficient detail. Nor does the opinion suggest that the scope of an EIS necessarily determines the scope of the alternatives that must be considered. Other factors relevant to the adequacy of an EIS as to a project subunit and its alternatives might include a comparison of the cost of the subunit with the cost of the project, a consideration of whether plans for the subunit involve environmental consequences significantly different in quality or quantity from the consequences of the entire proposal, a consideration whether environmental information relevant to the subunit parallels that relevant to the project, and a determination whether the subunit, if viewed in isolation from the project, would constitute a major federal action for which NEPA would require an EIS.

The detail required in an EIS is that necessary to establish that an agency in good faith objectivity has taken a sufficient look at the environmental consequences of a proposed action and at alternatives to that action.

**38.** *See* note 32 *supra*.

acidic waste in stainless steel tanks. ERDA contends that its discussion of this issue in its programmatic EISs is sufficient. We agree with ERDA. In the Hanford EIS, ERDA discussed the alternative of discontinuing its present system of solidifying nuclear waste to salt cake. It specifically considered and rejected the alternative acidic waste storage system identified by the district court.[39] In the Savannah River EIS, ERDA discussed the acidic waste system as an alternative to its present system of storing alkaline solutions in carbon steel tanks. It decided against adopting this alternative.[40]

The district court recognized that ERDA had discussed these alternatives, but ruled that neither EIS discussed relative durability and retrievability of the calcinated acid waste system "in any depth."[41] The district court's decision to require fuller consideration of this alternative was in error. The Supreme Court recently emphasized "that the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. at 555, 98 S.Ct. at 1217. The agency has substantial discretion in framing its discussion of an alternative and deciding which alternative to adopt. ERDA's treatment of acidic waste storage and its rejection of that alternative were within the range of reasonableness. Accordingly, we reverse the district court's decision to require an EIS discussing this alternative in greater depth.

3. Relief

■ It is undisputed that the nuclear waste storage tanks authorized for fiscal years 1976 and 1977 are needed to replace older tanks, some of which are leaking. The new tanks are undergoing construction and are scheduled for completion during 1979 and 1980.[42] NRDC does not argue that these tanks are unsafe. Rather, NRDC contends that the suggested safety and design alternatives may provide the "safest" method of storage.[43]

In this case, ERDA violated NEPA by failing to consider specific design and safety features that could be incorporated into the planned double-wall carbon steel tanks. If the agency had considered the suggested alternatives before deciding upon the tanks, it might have chosen to add certain design or safety features. It may still be possible, upon completion of an adequate EIS, for the agency to decide that it is worthwhile to modify the tanks. Thus, we remand to the district court for entry of an order requiring ERDA to prepare an appropriate EIS.

■ When NEPA violations occur in connection with an ongoing project, courts must decide whether the project should be halted pending completion of an EIS. "What is called for, in each case, is a 'particularized analysis' of the violations that have occurred, of the possibilities for relief, and of any countervailing considerations of public interest." *Alaska v. Andrus*, 188 U.S.App.D.C. 202, 222, 580 F.2d 465, 485 (quoting *Jones v. District of Columbia Redevelopment Land Agency*, 162 U.S.App.D.C. 366, 377, 499 F.2d 502, 513 (1974)), *vacated in part on other grounds sub nom. Western Oil & Gas Association v. Alaska*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).

The decision whether halting a project pending revaluation of environmental factors warrants the social and economic costs of delay rests in the sound discretion of the court. *See Realty Income Trust v. Eckerd*, 183 U.S.App.D.C. 426, 427, 564 F.2d 447, 457 (1977). The public interest to be served in the continued construction of the twenty-two waste storage tanks involved in this case is evident. NRDC agrees that "new tanks must be constructed to hold the

---

**39.** Final Environmental Impact Statement (ERDA–1538), *supra* note 22, at V–9 to V–10.

**40.** Final Environmental Impact Statement (ERDA–1537), *supra* note 22, at V–10 to V–11.

**41.** J.A. at 208.

**42.** *Id.* at 180.

**43.** Brief for NRDC at 21, 30 n.18.

wastes currently leaking from existing tanks." We are convinced that an injunction against construction of the tanks should not be entered pending completion of an EIS devoted to the safety and design alternatives raised by NRDC.

### III. CONCLUSION

We affirm the district court's decision on Count I of NRDC's complaint, remand that part of the decision on Count II dealing with design and safety features for entry of an order requiring ERDA to prepare an EIS, reverse the remainder of the decision on Count II, and vacate the decision on Count III for lack of jurisdiction. We affirm the decision of NRC.

*So ordered.*