**NEW ENGLAND POWER COMPANY
et al., Plaintiffs,**

v.

**Paul GOULDING et al., Defendants,**

**Town of Charlestown,
Defendant-Interventor.**

**Civ. A. No. 79–1889.**

United States District Court,
District of Columbia.

Dec. 4, 1979.

Charles A. Patrizia, Washington, D. C., for plaintiffs.

Lawrence R. Liebesman, Dept. of Justice, for defendants.

Karin Sheldon, Atty., Washington, D. C., for intervenor.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This matter is currently before the Court on defendants' motion for summary judgment and plaintiffs' opposition thereto. Plaintiffs, the New England Power Co. and the Narragansett Electric Co., seek to overturn a decision by the former Acting Administrator of the General Services Administration (GSA), Paul Goulding, disposing of a 604 acre parcel of federal property known as the Naval Auxiliary Landing Field (NALF) located in Charlestown, Rhode Island. Plaintiffs, who seek to use part of the property to construct a nuclear power plant, claim that the transfer of 307 acres to the Department of Interior (DOI), 60 acres to the Environmental Protection Agency (EPA), and 237 acres to the town of Charlestown, Rhode Island, violates the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, 4331 *et seq.*, the Federal Property and Administrative Services Act (FPAS), 40 U.S.C. § 471 *et seq.*, GSA regulations implementing the FPAS, and the Administrative Procedure Act, 5 U.S.C. § 704 *et seq.* In addition, plaintiffs claim that Acting Administrator Goulding was biased. Following a hearing for preliminary injunctive relief on August 17, 1979, the Court concluded that plaintiffs had failed to demonstrate a substantial likelihood of success on the merits. Upon further consideration of the papers submitted by the parties and the entire record herein, the Court concludes for the reasons set forth below that defendants' motion for summary judgment filed pursuant to Fed. R.Civ.P. 56 must be granted and that this action must be dismissed.

### Background

This case arises out of plaintiffs' efforts to obtain the NALF which was declared excess to the needs of the Navy in 1973. In 1974 and 1975, GSA attempted to negotiate a private sale of the property to NEPCO for use as the site for a nuclear power plant. GSA's action was enjoined by the United States District Court in Providence, Rhode Island, which held that NEPA required the preparation of an environmental impact statement before the property could be transferred to NEPCO. Pursuant to the Court's order, GSA prepared a draft environmental impact statement which discussed eighteen separate proposals for use of the property submitted by interested parties. After comments were received on the draft, a final environmental impact statement was issued on January 29, 1979. Acting Administrator Goulding then reviewed the EIS and the correspondence received since the issuance of the EIS. He analyzed all of the alternatives and concluded that the FPAS required that a total of 367 acres be transferred to DOI and EPA, and that the remaining land should be disposed of in a way which would be consistent with the uses of the DOI and EPA. He therefore decided that the balance of the property should be sold to the town of Charlestown for municipal, administrative and recreational purposes. This action ensued.

### Discussion

Plaintiffs' primary complaint with regard to NEPA is that the EIS failed to consider adequately a proposal for joint use of the property by plaintiffs and the DOI. A review of the EIS reveals, however, that approximately 150 pages were devoted to analyzing the environmental effects of a nuclear power plant and an additional two pages discussed plaintiffs' proposal for joint use. Thus the only question is whether NEPA requires more. The Court concludes that it does not.

In the recent case of *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978), the Supreme Court held that NEPA does not require an exhaustive analysis of every conceivable alternative put forth by interested parties. NEPA only requires an EIS to contain information "sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." *NRDC v. Morton*, 148 U.S.App.

D.C. 5, 14, 458 F.2d 827, 836 (D.C. Cir. 1972). In addition, the adequacy of an EIS must be judged on the basis of a "reasonableness" standard.

■ The EIS in this case satisfied these standards. Plaintiffs do not suggest that the analysis of the impact of its nuclear power plant proposal is inadequate. Rather, they argue that the detailed analysis on the water, soil, plant and animal resources in the area of the plant must be redone to accommodate plaintiffs' interest in sharing the property with DOI. NEPA simply does not require this. See Vermont Yankee, supra, 435 U.S. at 551, 98 S.Ct. at 1215. Thus the Court concludes that the decisionmaker had sufficient information from which to make a reasoned choice as to whether 120 acres of the NALF should be used for a nuclear power plant.

■ Similarly, plaintiffs' claims regarding the Administrative Procedure Act are equally unfounded. As noted in the Court's opinion denying the preliminary injunction, the scope of judicial review is limited to determining whether the agency has presented a rational basis for its decision and whether it has "demonstrably . . . given reasoned consideration to the issues, and has reached a result which rationally flows from its conclusions." Sierra Club v. EPA, 176 U.S.App.D.C. 335, 345, 540 F.2d 1114, 1124 (D.C. Cir. 1976). The record reflects that at the time the Acting Administrator rendered his decision he had the views of all interested parties before him, including plaintiffs'. His decision paper demonstrates the consideration given to plaintiffs' proposal and points out the ecological factors militating against any major construction project at the site. The paper also analyzes the proposals submitted by

DOI, EPA and the town of Charlestown and the basis for transferring the property to each of them. Thus, the record establishes that the Administrator evaluated the alternatives and presented a rational basis for his decision in accordance with the requirements of the APA.

Plaintiffs' claims under the FPAS must also fail. In this regard, plaintiffs complain of the manner of disposal of the property under the Act and GSA regulations.

It is clear that the FPAS establishes a federal preference for disposal of the property. To this end GSA and all other federal agencies are required to make excess property available to other federal agencies to meet their needs before they give consideration to disposing of the property to non-federal bodies.[1] In this case DOI and EPA applied for transfer of the NALF and explained the uses to which they would put the property in order to fulfill their statutory responsibilities. The record reflects that the Acting Administrator evaluated and accepted the representations of the federal agencies as to their needs. Indeed plaintiffs have not suggested that the needs of DOI and EPA are not legitimate.

■ Therefore, the only issue is whether the decision to dispose of the remaining or surplus[2] property to the town of Charlestown was an appropriate exercise of the discretion vested in the Administrator under the Act and applicable GSA regulations.

In 1970, Congress enacted the provision under which the Town is to receive the 182 acre parcel, 40 U.S.C. § 484(k)(2). In so doing, Congress emphasized both the value of making surplus property available to local governments for park and recreation purposes and the fact that the GSA had the

---

1.  40 U.S.C. § 483 provides in pertinent part:
    (a) In order to minimize expenditures for property, the Administrator (of GSA) shall prescribe policies and methods to promote the maximum utilization of excess property by executive agencies, and he shall provide for the transfer of excess property among Federal agencies . . .
      *   *   *   *   *   *
    (c) Each executive agency shall, as far as practicable, . . . (2) transfer excess

property under its control to other Federal agencies . . .

2.  40 U.S.C. § 472 provides:
    (g) The term "surplus property" means any excess property not required for the needs and the discharge of the responsibilities of all Federal agencies, as determined by the Administrator.

discretion to decide whether the land should be used for those purposes. H.R.Rep.No. 91–1225, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News, pp. 4300, 4304.

The final question here, then is how much weight GSA must give to the Town of Charlestown's request for the 182 and 55 acre parcels. The answer, as stated in the legislative history quoted above, is that the decision is within the sound discretion of the Administrator, but that Congress has indicated, through the passage of 40 U.S.C. 484(k)(2) and through the structure of § 484 itself that the Administrator is to give particular attention to the conservation and recreation values and to the needs and requests of state and local governments.

The Acting Administrator correctly ruled that the 367 acres will be transferred to EPA and Interior for wildlife conservation purposes. Having done so, he added further weight to the Town's claim, since the Town's proposed uses are particularly consistent with the activities to be carried out by EPA and Interior.

Thus, plaintiffs' claim that the Administrator violated the FPAS and GSA regulations pertaining to the optimum use of the property is refuted by the decision itself. In accordance with the terms of the FPAS, Acting Administrator Goulding gave the needs of the federal agencies priority. In the exercise of the discretion vested in him by the Act he considered and decided that the Town of Charlestown's proposal further effectuated the federal uses.

Finally, plaintiffs seek to probe the mind of the decisionmaker to determine if he was biased. This claim is based on Goulding's personal familiarity with his home state of Rhode Island and his having campaigned for Senate from Rhode Island three years earlier on an anti-nuclear power platform.

The standard that applies in determining whether a decisionmaker is biased is set out in *Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289 (8th Cir. 1972), in which the Court upheld the validity of an environmental impact statement despite the fact that officials responsible for preparing the statement had stated that the dam in question would be built. Rejecting the bias claim, the Court held that

> The test of compliance with § 102, then, is one of good faith objectivity rather than subjective impartiality.

*Id..* at 296. Similarly, in *Carolina Environmental Study Group v. U. S.*, 166 U.S.App. D.C. 416, 510 F.2d 796 (D.C. Cir. 1975), this Circuit held:

> Agencies are required to consider in good faith, and to objectively evaluate, arguments presented to them; agency officials, however, need not be subjectively impartial.

*Id.* at 421, 510 F.2d at 801.

In this case, the decision itself shows a thorough consideration of all of the arguments, including those made by NEPCO, and it reflects an objective evaluation of the alternatives. There is nothing to indicate that the Acting Administrator was in any way wedded to his earlier campaign statement now that he was in a completely different position with specific statutory duties. Agency officials are "assumed to be men of good conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *Withrow v. Larkin*, 421 U.S. 35, 55, 95 S.Ct. 1456, 1468, 43 L.Ed.2d 712 (1975).

NEPCO had not offered any evidence which would rebut the presumption of good faith accorded the Administrator's decision. Goulding's position three years earlier or his familiarity with voter sentiment in Rhode Island is, in the Court's view, legally insufficient to uphold a claim of bias which would merit overturning this action.

Accordingly, for the foregoing reasons, the Court concludes that defendants' motion for summary judgment must be granted. An appropriate order is entered herewith.